# F. R. Patch Manufacturing Co. *v.* Protection Lodge No. 215, I. A. of M.

## May Term, 1904.

Present:   Rowell, C. J., Tyler, Munson, Start, Watson, and
Stafford, JJ.

### Opinion filed February 22, 1905.

*Strikes—Boycott—Interference with Business—Conspiracy—
Evidence—Motion for New Trial—Denial—Exception—
Failure to File Statement of Facts.*

In an action against a lodge of a machinists' union to recover damages
for interfering with plaintiff's business by means of a strike, in-
timidation of workmen, boycott, etc., in pursuance of a conspiracy
between the defendant and others, when there was some evidence
of such conspiracy between the defendant and a carpenters' union,
it was proper to allow plaintiff's president to testify that one of
its employees, who was a member of the carpenters' union, told
him that he had been ordered by his union to quit work, but that
he would later withdraw from the union and return to work; it
appearing that he did not withdraw from the union, but remained
an active member, and that he had no personal grievance.

The fact that two written communications to the plaintiff relative to
the demands of the defendant, and purporting to emanate from
the defendant and from a "committee" of the defendant, bore the
impress of the defendant's seal, was a circumstance proper for
the jury to consider as tending to show that those papers eman-
ated from the defendant, although it was not a corporation.

The fact that five of the ten members of defendant lodge whose names
were signed to a written communication to the plaintiff relative
to a settlement of defendant's demands, and purporting to em-
anate from a "committee" of the defendant, and bearing the im-
press of its seal, subsequently called upon the plaintiff in relation
to the strike brought about by the defendant, was proper for the
jury to consider in connection with the denial of these men that
they signed the paper or were authorized by the defendant to
sign it.

Many circulars relative to the strike of plaintiff's employees, which
was ordered by the defendant, were posted and widely distributed.

These circulars bore the names of defendant's officers, and were obviously designed to prevent other workmen from entering plaintiff's employment. *Held*, that the jury might properly infer that the defendant promoted the distribution.

Every person entering into a conspiracy or common design already formed is deemed in law a party to all acts done by any of the other parties, either before or afterwards in furtherance of the common design.

Any declarations made by one conspirator, pursuant to the common object and in furtherance of it, are admissible against all, when the combination is once established.

The plaintiff may first either prove the conspiracy which renders the acts of the conspirators admissible in evidence, or he may prove the acts of the different persons, and thus prove the conspiracy.

There being some evidence to show the alleged conspiracy, and that a certain man had been hired by a committee of the defendant to prevent men from entering plaintiff's employment, evidence that this man used violence to prevent a man going to work, and that when admonished he said, "Hell with your injunction; do your worst," is admissible.

Testimony of a witness that he went out on the strike ordered by the defendant, and went to a hall used by the defendant, accompanied by one of defendant's members, who promised him money and board if he would strike, was properly admitted, there being some evidence tending to show the alleged conspiracy between the defendant and the union to which the witness belonged.

Testimony of a witness who was secretary of a council composed of delegates from various labor organizations, including the defendant, that he told a plumber, who was plumbing a house in which plaintiff intended to board its employees, that the union was anxious to bother the people who were coming to work for the plaintiff and see if they could induce them to go back and not work, and that he asked the plumber not to complete the job, was admissible, there being some evidence of the conspiracy alleged.

Since all the evidence received on behalf of the plaintiff had some tendency to prove the conspiracy charged and ultimately became pertinent to that issue, there can be no complaint as to the order of proof.

A request to charge that plaintiff could not recover for expenses incurred in securing other workmen to take the positions of the

men who left plaintiff's employment was properly refused, as ignoring the question whether these men were hindered from entering the plaintiff's employment by coercion or intimidation on the part of defendant or of those with whom it was in conspiracy.

A request to charge that any threat made by the defendant, or by any one associated with it, to boycott any boarding house keeper who entertained, or any merchant who supplied with the necessities of life, workmen in the employ of the plaintiff, if made directly and exclusively to such boarding house keeper or merchant, was not an interference with the rights of plaintiff, was properly refused.

When a judge drops a word or expression, in the course of a long charge, so contrary to its whole theory and so plainly error as to force the impression of inadvertence, it is the duty of counsel to call attention to it, and not let it pass in reliance upon a general exception in the event of an adverse verdict.

Although a charge may contain some expressions which, taken alone, would be error, yet if, as a whole, it is sound, and there is no fair ground to say that the jury has been misled, it ought to stand.

Plaintiff requested the court to charge that, if the jury find the conspiracy charged, and that labor unions in the conspiracy concealed their records, the jury might find the "facts" charged in the declaration established by the presumption arising from the suppression of the records of a co-conspirator, and the requested instruction was given except that the word "damages" was used instead of the word "facts." *Held,* that it was the duty of counsel to have called the attention of the court to this change, that an exception to the compliance with the request did not reserve that question; and that this evidently inadvertent change could not have harmed the defendant, the court having instructed that the burden of proof was on plaintiff, and that the mere fact that its men struck, and plaintiff thereby suffered damage, did not entitle plaintiff to recover.

The fact of a common design existing between the different associations with whom the defendant is alleged to have conspired, makes the records of the other associations the records of the defendant, provided the conspiracy is established.

In the instruction that if defendant, having been notified to produce books and papers, failed to do so, the jury would have a right to presume that it was because the books and papers, if produced,

would operate against its claim and in favor of plaintiff's claim, the word "failed" is equivalent to the word "refused."

The presumption arising from the fact of spoliation of evidence does not relieve the other party from introducing evidence tending affirmatively to prove his case so far as he has the burden.

The court charged that if the defendant had books which it suppressed, and which it failed to produce after having been notified to do so, the jury might "find or presume that the claim of the plaintiff is true, and that the claim of the defendant is false." *Held*, that this did not amount to an instruction that, if the jury found that the books had been suppressed, they might presume, without other proof, that such books contained evidence of a conspiracy, the court having immediately thereafter explained what the claims of the parties were—the plaintiff's, that there had been coercion and intimidation resulting in damages; the defendant's, that it had only advised, but did not attempt to interfere with the free choice and judgment of the workmen.

When, on a motion to set aside a verdict because of the misconduct of a juror, the county court heard testimony on both sides, denied the motion, but filed no statement of facts, the question cannot be reviewed on exception.

CASE. Plea, the general issue. Trial by jury at the March Term, 1903, Rutland County, *Haselton,* J., presiding. Verdict and judgment for the plaintiff. The defendant excepted. After verdict and before judgment thereon the defendant filed a motion that the verdict be set aside and a new trial granted because of the misconduct of a juror during the trial. The court heard testimony on both sides and denied the motion, to which the defendant excepted. But the court filed no statement of facts found.

The defendant is an unincorporated association. Service was made under V. S. 1099, which provides that such an association consisting of five or more persons, and having a president or other principal officer, a clerk or treasurer, may sue or be sued in its associate name; and that service of process against such association made upon either of such officers

shall have the same force and effect as if served upon all the associates.

V. S. 1183 provides that, if execution obtained on a judgment against such association is returned unsatisfied in whole or in part, a suit for the amount unpaid may be brought against any of the associates.

*Peter F. McManus, Thomas H. Browne,* and *James K. Batchelder* for the defendant.

The talk between Patch and the committee of five was inadmissible. It did not tend to show any conspiracy between the lodge and its members. *Com.* v. *Smith,* 168 Mass. 130; *Com.* v. *Scott,* 123 Mass. 222; *Com.* v. *Smith,* 163 Mass. 418.

The court erred in its charge as to force of the presumption arising from the suppression of defendant's books. The court, in effect, ordered a verdict for the plaintiff. The true rule as to this presumption may be seen from the following authorities. In Best on Presumptions § 148; *Saltern* v. *Malhuish, Amb.* Chancery Report, 247; *Lawson* v. *Sherwood,* 1 Starkie Rep. 251; *Braithwaite* v. *Coleman,* 1 Har. 229; *Bott* v. *Wood,* 56 Miss. 136; *Cooper* v. *Gibbons,* 3 Campb. 363; *Thompson* v. *Thompson,* 9 Ind. 323; *Life Ins. Co.* v. *The Mechanic Fire Co. of New York,* 7 Wend. 31; *Southern Pac. Co.* v. *Johnson,* 69 Fed. 559; *Rector* v. *Rector,* 8 Ill. 105; *The Attorney General* v. *Le Merchant,* 2 Term Rep. 201; *Hanson* v. *Eustace,* 2 How. 653-708; *Spring Garden Mutual Ins. Co.* v. *Evans,* 9 Md. 1 and 17; *Connell* v. *McLoughlin,* 28 Or. 230, 42 Pac. Rep. 218; *Bechmeyer* v. *Ins. Co.,* 87 Wis. 325, 58 N. W. 403; *Chaffee* v. *U. S.* 18 Wall. 516; Lawson on Presumptive Evidence 180, R. 23; *Askew* v. *Odenheimer,* 1 Baldw. 390; *Bott* v. *Wood,* 56 Miss. 136; *Cowper* v. *Cowper,* 2 P. Williams 748; Lawson on Presumptive Ev. 195-6, R. 25.

The plaintiff could not recover for any threat made by defendant directly and exclusively to any merchant or boarding house keeper. *Williams* v. *Vanderbilt,* 28 N. Y. 217; *Lamb* v. *Stone,* 11 Pick. 526; *Anthony* v. *Staid, et ux.* 11 Met. 290; *Piper* v. *Kingsbury,* 48 Vt. 480; *Luce* v. *Hoisington,* 56 Vt. 436; *Dennis* v. *Stoughton,* 55 Vt. 371; *Bovee* v. *Danville,* 53 Vt. 183; *Boutwell* v. *Marr,* 71 Vt. 1; *Protection Ass'n* v. *Cumming,* 170 N. Y. 314.

*Joel C. Baker, Orion M. Barber* and *Marvelle C. Webber* for the plaintiff.

It is a conspiracy for two or more persons to combine to injure another's business. *State* v. *Glidden,* 55 Conn. 46, 71; *Boutwell* v. *Marr,* 71 Vt. 1, 8; *Christensen* v. *People,* Chicago Legal News, Vol. 36, No. 40, (1904) *U. S.* v. *Sweeney,* 95 Fed. R. 434; *The Glamorgan Coal Co. et al* v. *The South &c., Federation,* 19 Times Law Rep. 701; *Giblan* v. *The National &c., Union,* 19 Times Law Rep. 708; *Arthur* v. *Oaks,* 63 Fed. R. 310; *Doremus* v. *Hennessy,* 176 Ill. 608; *Hawarden* v. *The Younghiogheny &c., Co.,* 111 Wis. 545; *Barr* v. *Essex Trades Council,* 53 N. J. Eq., 101; *Quinn* v. *Leathem,* L. R., App. Cas., 495, 506.

Everything said, done, or written by any one of the conspirators in furtherance of the common purpose, including the suppression of books or other evidence, is a relative fact against each of them. Stephens Dig. of Ev. (New Eng. Ed.) Art. 4; *State of Vermont* v. *Thibeau,* 30 Vt. 100; *Jenne* v. *Joslyn,* 41 Vt. 478; *State* v. *Glidden,* 55 Conn. 46, 79; *State* v. *Dyer,* 67 Vt. 690, 702; *People* v. *Mather,* 4 Wend. 229, 260.

In proving a conspiracy, slight evidence of collusion is all that is required. *Brenham* v. *Carey,* 11 Wend. 83; *Crary* v. *Sprague,* 12 Wend. 41; *Kelley* v. *People,* 55 N. Y. 566; *Spies* v. *People,* 122 Ill. 1.

It is for the jury to determine what inferences are to be drawn from the failure of a party who has books and records, to produce them after notice to do so, without showing good cause therefor. 1 Jones on Ev. § § 17, 18; 2 Wharton Ev., § § 1266, 1268; *Jackson* v. *M'Vey,* 18 Johns. 330, 334; *Life etc. Ins. Co.* v. *The Mechanic Fire Ins. Co.,* 7 Wend. 31, 34; *Thayer* v. *Middlesex Fire Ins. Co.,* 10 Pick. 326, 329, 330; *Hanson* v. *Eustace's Lessee,* 2 How. (U. S.) 653, 708; *Clifton* v. *U. S.,* 4 How, 242, 246; *Barton* v. *Lyon,* 22 Barb. (N. Y.) 622; *Bleecker* v. *Johnson,* 69 N. Y. 309, 311; *Eldridge* v. *Hawley,* 115 Mass. 410, 412; *Arbuckle* v. *Templeton,* 65 Vt. 205, 211.

But where books and records have been called for, and ordered to be produced, and they are not produced, but are hidden, carried away, or destroyed by the defendant or its coconspirators, then the rule is *omnia praesumuntur contra spoliatorem.* 1 Jones Ev. § 16; 1 Greenleaf Ev. § 37 and 195c; Best Ev. 413; *Bleecker* v. *Johnston,* 69 N. Y. 309, 311; *Armory* v. *Delamirie,* 1 Smith's Lead. Cas. 636; *White* v. *Lincoln,* 8 Ves. 983; *Roe* v. *Harway,* 4 Burr. 2484; *Holden* v. *Harney,* 4 Burr. 2487; *Attorney General* v. *Windsor,* 24 Beav. 679; *Crisp* v. *Anderson,* 1 Stark. 35; *Davie* v. *Jones,* 68 Me. 393; *Paige* v. *Stephens,* 23 Mich. 357; *Thompson* v. *Thompson,* 9 Ind. 323; s. c. 68 Am. Dec. 638; *Riggs* v. *Penn. & N. E. R. Co.,* 16 Fed. 804; *Blade* v. *Noland,* 12 Wend. 173, s. c. 27 Am. Dec. 126 and note; *Joannes* v. *Bennett,* 5 Allen 169; The Olinde Rodrigues, 91 Fed. 274, 284, s. c. 174 U. S. 510, 528.

TYLER, J. This is an action on the case brought by the plaintiff, a corporation, against the defendant, a partnership and unincorporated association consisting of more than five members and having a president, secretary, clerk and treasurer, to recover damages for the defendant's alleged unlawful

acts of interference with the plaintiff in the prosecution of its business.

It appeared that the plaintiff, prior to the acts complained of, was a manufacturing corporation duly organized under the laws of this State, located and doing business in the city of Rutland; that its business was the manufacture of machinery for mills and stone work of all kinds, also of various other kinds of machinery and engines, and it carried supplies for steam fitters and mills in this and other countries; that it had erected an expensive and valuable plant with adequate power, and employed about one hundred skilled machinists, also moulders and other workmen; that it had a large amount of capital invested in its business which was carried on at a profit, and that at the time of the alleged wrongful acts of the defendant it had contracts on hand with customers to furnish them its goods at a profit when manufactured.

The defendant association was composed of machinists, many of whom were employed in the mills and shops of the plaintiff, and the plaintiff claimed that the defendant conspired with its members and with other labor organizations in Rutland and vicinity to force the plaintiff to adopt a schedule of hours of labor by which nine hours should constitute a day's work, and to increase the wages of its workmen so that the plaintiff could not do business at a profit nor complete its contracts except at a loss; that the plaintiff refused to comply with this demand, and that thereupon, on May 20, 1902, the machinists, at the order and direction of the defendant, quit their work and conspired and confederated together and with divers other persons unknown to the plaintiff, to oppress the plaintiff and force it to accede to their illegal demands, and by threats, intimidations, bribery and violence sought to intimidate and drive away the other workmen of the plaintiff, and detailed pickets, spies and watchmen to stand guard about

and near the plaintiff's works and prevent other workmen taking employment therein; that they intercepted and prevented, by threats, bribes and violence, other men whom the plaintiff had employed and who were on their way to Rutland, from engaging in the plaintiff's service; and that in carrying out their conspiracy, by threats and intimidations, they caused a large number of workmen whom the plaintiff had employed and who had entered upon its service to quit its service; that the defendant and its co-conspirators visited the keepers of boarding-houses and merchants, and by threats to boycott and injure their business induced and coerced them to refuse to board and entertain and to sell goods and necessaries to such workmen; that they made attacks upon boarding-houses where the workmen were boarded, and attacked, assaulted and annoyed them on the streets and at their boarding-houses and thereby drove away from the plaintiff's employment large numbers of such workmen, all which conduct injured the plaintiff in its business.

The defendant denied the conspiracy alleged and claimed that whatever was done by it and the other associations was, through a lawful combination among them, to effect by lawful means the lawful purpose of forcing the plaintiff to lessen the hours of labor and increase the wages of workmen.

No question was made in the court below in respect to the sufficiency of the declaration, therefore it cannot be considered here.

The plaintiff offered evidence tending to establish all the material allegations in the declaration, most of which was received under the defendant's exception. The defendant relies upon seven exceptions to the admission of evidence.

I. The testimony of Patch about the visit of a committee, and what they said to him; the admission of plaintiff's exhibits 1 and 2 and all that Patch testified to upon the sub-

jects to which they related, and especially to all that the committee said to him upon that occasion. This exception was taken upon the ground that it was not shown that the committee was a committee of the defendant:

2. To the testimony in respect to the threats and acts of McDonald:

3. About the distribution and posting of exhibits 4 and 5, called "stickers:"

4. The testimony of Alexander Sanchegrin on the ground that there was no proof that Page was a member of defendant lodge, nor that E. A. U. Hall was used exclusively by that lodge:

5. As to all testimony in respect to the acts of Pennington and others relating to a boycott:

6. To the testimony relating to the acts of Young and Hines:

7. To all testimony respecting the conduct of Martin for the same reason.

All these exceptions were upon the ground that if the various acts testified to were in fact committed, the plaintiff had failed to show that the defendant directed or sanctioned them, or was in any way responsible for them; that these acts, if committed, were upon the motion alone of the plaintiff's striking employees for the purpose of shortening time and increasing wages, and that these acts did not emanate from the defendant lodge nor any of the other lodges mentioned, and were not evidence of the conspiracy alleged.

1. The plaintiff's evidence tended to show that, being engaged in business as alleged, on May 11, 1902, it received a written communication which reads: [Plaintiff's exhibit 2.] "International Association of Machinists.

Rutland, Vt., May 11, 1902.

To the Patch Manufacturing Co.,

Gentlemen:—Representing the machinists employed in your shop, we respectfully request that you establish the following conditions in the Patch Manufacturing works:

1. Fifty-four hours to constitute a week's work. Any time over this to be considered overtime and to be paid for at the rate of time and one-half:

2. That the company recognize the union and union principles.

In explanation we would say that we must be governed by the Grand Lodge I. A. M., and to hold our charter and remain union men we are forced to ask recognition. We further call your attention to the fact that only union work goes in many places and we have to endorse your product as fair. If we do so longer, we feel that we must receive the benefits.

If the capacity of shops is insufficient we suggest that our union men will always be glad to help out any situation by working evenings or to help out the same as at present.

We mean by recognition of the union the meeting of shop committee to settle any differences on the same plan as moulders. Will be pleased to receive your reply on or before Wednesday night, May 14, addressed to Protection Lodge No. 215, Rutland, Vt.

(Seal of Protection Lodge.)"

The plaintiff's evidence also tended to show that on May 20 a large number of the plaintiff's machinists and other workmen struck and left its employment, and that a few hours later on that day F. R. Patch, who was the plaintiff's president and general manager, found upon his desk a written communication stating that the committee of Protection Lodge No. 215, I. A. of M. would meet at the E. A. U. Hall at 3 P. M. that day, and that any communication would be re-

spectfully considered. This paper had upon it an impress of the seal of the defendant lodge and had appended the names of ten men, five of them purporting to be those of J. A. Keenan, N. J. Howley, J. E. Capeless, J. P. Hinchey and M. H. McLaughlin, five of the machinists who had struck and who were afterwards shown to have been at that time members of the defendant lodge; that these five men afterwards called upon Mr. Patch for an answer, but made no reference to either of said papers, and the defendant's testimony tended to show that these five men never signed, authorized or knew of the last named paper.

The plaintiff's evidence tended to show that the defendant and some or all of its members confederated together and with other lodges of other classes of workmen and the members thereof, and in like manner drove away from the plaintiff's service workmen of the plaintiff who did not strike and leave the plaintiff's service on May 20th and other workmen whom the plaintiff had since that time employed.

Among the specific acts that the plaintiff's evidence tended to show were committed by the alleged conspirators were that they detailed pickets and special watchmen to watch the railroad station for the arrival of men, to patrol the streets of Rutland, to stand guard about the plaintiff's works to prevent other workmen from taking employment therein; that they sent out spies and watchmen upon the roads and railroads leading to Rutland and intercepted men who were on their way to enter the plaintiff's service, and by threats, bribes and promises in many cases prevented such men from entering the plaintiff's service; and that the defendant also combined and confederated with other persons unknown to the plaintiff to do and in doing the acts alleged.

That after the strike was on the defendant appointed Walter Newton and John E. Capeless, two of its members, to

conduct the strike, and that they employed one Martin to assist them. The testimony of the defendant's recording secretary tended to show this fact.

The plaintiff's evidence tended to show that Martin was active in intercepting men who were on the trains and public roads going to Rutland to take the places of men who had left the plaintiff's employment, and by promises, threats, intimidation and personal violence he tried to turn them back and prevent their engaging in its service, and in some cases he succeeded in so doing.

There were other lodges of workmen in Rutland with numerous members, and some of the members of some of these lodges were in the plaintiff's employment.

The plaintiff's testimony tended to show that by reason of the wrongful acts of the defendant it was unable to complete its contracts and take others and was injured in its business.

Mr. Patch testified, under defendant's objection and exception, that on September 23rd eight new employees arrived, when he heard a disturbance at the entrance to the plaintiff's works, went out and saw a large mob, and that one Vincent, who was then in the plaintiff's employment, was being roughly handled by McDonald, a man who had been in the plaintiff's employment until the strike; that the witness warned McDonald that he was violating the injunction and that the latter replied: "Hell with your injunction; do your worst;" that McDonald made threats to Vincent if he returned to work. The plaintiff did not show, nor did any testimony in the case tend to show that McDonald was a member of Lodge 215, or had any connection whatever with the strikes, or that any of the strikers or any of the members of the lodge, or anybody connected with the claimed conspiracy, approved of what he said or did, excepting so far as his acts

above set forth tend to show these things; and excepting, also, so far as such testimony may be presumed as tending to show these facts from the failure of the defendant to produce its books and records and lists of membership. The plaintiff claimed that the defendant's books and records and lists of membership, called for and ordered to be produced and not produced, would have shown all these facts.

This incident was only one of many incidents introduced by the plaintiff tending to show intimidation and interference with the plaintiff's workmen and with men brought to Rutland by its agents for the purpose of filling the places of the strikers. The testimony in many of the other incidents tended to show that such intimidation and enticement of and interference with the plaintiff's workmen and men seeking its employment, were done by members of the defendant lodge, its agents and co-conspirators; and much evidence of that class was admitted without objection.

The issuing of plaintiff's exhibits 4 and 5 were not shown to have been done directly by the defendant. Witnesses testified to having seen the circulars in the office of the machinists, which was the headquarters of that class of workmen when they were out of employment, and these circulars were sent to the different machinists' offices throughout the country. They were admitted under defendant's exception and are:

Plaintiff's exhibit 4.     ' "Rutland, Vt., May 20, 1902.

### TROUBLE IN RUTLAND.

We have been on strike since May 20th, and we are obliged to continue the fight to the end:

Therefore, This is to apprise all Machinists and Helpers, Metal Workers, Blacksmiths and others that their fellow toilers in Rutland, Vermont, are on a strike against the unreasonable refusal of the Lincoln Iron Works and F. R.

Patch Mfg. Co., to accede to the request for a fair adjustment of time and pay.

(Typographical Union label, Rutland, Vt.)"

Plaintiff's exhibit 5.

"Rutland, Vermont, September 1, 1902.

Trouble in Rutland since May 20, 1902.

This is to notify Machinists, Molders, Metal Workers, Blacksmiths, and others, that

The strike is still on

at the F. R. Patch Mfg. Co., and Lincoln Iron Works, and will be kept on until we get a fair adjustment of our demands.

(Typographical Union label, Rutland, Vt.)"

The plaintiff claimed, and introduced testimony tending to show, that money was paid by the defendant and by its individual members to induce men to leave the employment of the plaintiff, during the strike, which continued several months, and to keep men from entering its employment, and introduced as a witness Alexander Sanchegrin who testified that he went out with the men on the strike and then went to the E. A. U. Hall in company with Howley, and under the defendant's exception testified that Howley promised him six dollars a week and his board if he would go out and that he received fifty cents; that Howley got the money from Page. There was no proof that Page was a member of defendant lodge, nor of any other lodge, nor that he was connected with the strike, excepting that the plaintiff's testimony tended to show that Page was then in said hall with Howley, and whatever presumption might arise that Page was a member of defendant lodge and a conspirator with the defendant from the failure of the defendant to produce its books, records and list of membership. It appeared that this hall was not used exclusively by said lodge nor controlled by it, that it belonged to a third party, that this and various associations

held meetings in it, that the defendant used it as a lodge room, and that it was used for various purposes before and during the strike. The plaintiff claimed that the records would have shown that Page was a co-conspirator with the defendant.

The plaintiff's evidence tended to show that after the strike was on, Walter Newton, who was a member of defendant lodge, and one Pennington, who was a member of the Retail Clerks' Protective Association and at that time secretary of the Central Trades and Labor Council, interviewed a firm that was engaged in the plumbing business and was then plumbing a boarding-house which the plaintiff was repairing for the purpose of boarding its workmen therein, and by threats and intimidations tried to induce said firm not to do such plumbing, and that this was done to prevent the plaintiff from providing a place for boarding and lodging its workmen and thus prevent it from obtaining them.

The testimony as to Pennington's acts stands upon the same ground as Newton's. He went with Newton to visit the plumbers, as before stated, but it was not shown that either went by the procurement or knowledge of the defendant nor of any other lodge, but for anything that appeared, of their own motion, excepting that Newton was a member of defendant lodge, a member of the strike committee appointed by the defendant and a delegate to the Central Trades and Labor Council, and that Pennington was then a member of and secretary of that Council.

Pennington testified that during the summer of 1902 he was secretary of the Council which was composed of three delegates from each one of the several unions in Rutland and vicinity; that Protection Lodge No. 215 was one of these unions at the time he was secretary, and that Walter Newton was at one time a delegate to the Council. Pennington's testimony tended to show that the matter of the strike was

brought up more than once at the meeting of the Council in the summer of 1902 by the delegates from defendant lodge; that they explained the situation and the different delegates talked it over, and that he signed the plaintiff's exhibit No. 3, "Central Trades and Labor Council, C. W. Pennington, secretary," but could not say whether he signed it for the Council or not. In cross-examination he said he had no authority to sign it, and that so far as he knew the Council never authorized, sanctioned or indorsed his action in signing it, and that it was never to his knowledge brought to the attention of the Council. The plaintiff claimed that the books and records of the Council called for and not produced would have shown, had they been produced, that he signed said exhibit by the authority of the Council, and that the Council authorized, sanctioned, and indorsed it. The plaintiff also claimed that the books and records of the defendant would have shown that the authorization and approval were at its request and in furtherance of the plans of conspiracy; and, under the defendant's exception, Pennington was allowed to testify, among other things, that he told Loveland that the union was anxious to bother, in a certain way, the people who were coming there to work for the plaintiff, make it a little unpleasant for them without violence, and see if they couldn't get them to go back and not work, and that he asked Loveland not to complete the job of plumbing. Pennington testified that he and Newton told Loveland that if the report were circulated that he was doing this work, possibly he would lose some individual trade he was getting at that time; that this was their opinion in the matter.

The plaintiff's evidence tended to show that Tilly C. Young was a member of the Carpenters' Union, and until the 1st of July, 1902, its secretary; that Hines was in the plaintiff's employment, and was also a member of that union, and

that they requested a private meeting with Patch; that they told him they had been ordered by their union to quit work that night, under a penalty of a fine of five dollars a day; that they were being watched by delegates from that Union and asked Patch's advice, which being refused, Young said he should go out, withdraw from the Union and then return to work if Patch would allow it; that Hines said he would stay and Young said he would go out and went. Patch was allowed to testify, under defendant's exception, that he told Young that he would keep his place for him if he returned. Neither Young nor Hines were members of defendant lodge, but were members of the Carpenters' Union.

The testimony of Patch as to his interview with Young, a member and the secretary of the Carpenters' Union, was properly admitted for the purpose for which it was offered. The plaintiff had introduced evidence tending to show a conspiracy with the defendant on the part of the Carpenters' Union. It is true that neither the defendant nor the Union could be affected by Young's declarations, which were not in further-ance of the common design, or did not accompany and explain an act then being done by him in such furtherance; but mere words may be an act, as were the shouts of the mob in *Lord Gordon's* case, 21 How. St. Tr. 535, and the conversation among conspirators in *Lord Stafford's* case, 7 St. Tr. 1218, and in *State* v. *Glidden,* 55 Conn. 46, 82. So a letter may be an act, though never sent, as in Hardy's case, 24 State Trials, 199, 475. But here was a physical act being done by Young which his declarations accompanied and tended to explain, namely, his striking work at the plaintiff's plant. It is argued that the fact that he then arranged with Patch to come back as soon as his secretaryship expired, and he could legally with-draw from the Union, showed that his leaving was not in furtherance of the conspiracy but for his own benefit, and

against the interest of the conspirators. But he went out at the call of his Union having no grievance of his own. He did not return, and Patch never met him again. He did not withdraw from the Union, but remained in it and was re-elected secretary six months afterwards, held the office until the trial, and as secretary executed votes and orders of the Union in respect to the strike. He conducted in such a manner as a witness, when called by the plaintiff to produce the books and records of the Union and in disobeying the subpoena served on him for that purpose, that he was ordered into custody and required to show cause why he did not obey the subpoena. He was told that when his examination was completed the court might be satisfied that he did not intend to perjure himself, but whether the court became thus satisfied does not appear. The evidence and the proceedings shown by the transcript, which is referred to for all purposes relevant to the exceptions taken, fully justify the inference, if indeed they do not force the conclusion, that Young struck with no intention of returning, and that his arrangement with Patch was a mere pretext to conceal the real purpose of his going out; all which justifies the further inference that he was acting in connection with the conspirators in furtherance of a common purpose. His act and declarations, therefore, viewed in this light, as the jury had a right to view them, concurring as they did with the acts of the defendant and of the Union in point of time and in adaptation to accomplish the same object, tended to make Young a conspirator with both of them, and consequently were admissible.

It appeared that the defendant sent delegates to the Council, and the evidence tended to show that at different times these delegates brought up the subject of the strike in the Council and explained the situation; that the matter was talked over among the different delegates, but that it did not appear

that any action was taken by the Council except that the plaintiff's evidence tended to show that Jones and Stockwell, who had interviewed the Combination Cash Store people, represented themselves as a committee from said Council for the purpose of boycotting the store.

That members of the Plumbers' Union, of the Central Trades and Labor Council, and of the Carpenters' Union, who were claimed to be co-conspirators with the defendant, visited the store and tried to induce its officers to refuse to sell goods to the plaintiff's workmen who had refused to strike, and to other workmen who had been employed.

The plaintiff claimed that exhibit 3 tended to show the conspiracy between the defendant and its members, said Council and the Carpenters' Union and their members, and that the books and records would have shown such conspiracy. Pennington testified that he had no authority for signing exhibit 3; that there was no action of the Council authorizing him to sign it; that the Council never sanctioned it; that it was presented to him for signature; that he signed it without reading it, and that he thought it was a paper that should be signed. The plaintiff claimed that the books and records would have shown authority from the Council to Pennington to sign said exhibit which reads:

"Notice to Union Men.

Rutland, Vt., Oct. 10, 1902.

To Organized Labor, Everywhere.

Greeting: The F. R. Patch Mfg. Co. and Lincoln Iron Works are on the unfair list, having been placed there by the General Executive Board of the International Association of Machinists, and also by the International Association of Marble Workers at their convention held in Detroit, Mich., June 23 and 24, 1902. The above named firms are members

of an association composed of the leading machine and marble manufacturers of this vicinity, who have been and are now discriminating against members of the Union, whose avowed purpose is to crush the labor organizations of this vicinity. We have been on strike since the 20th of last May for the nine-hour day and just treatment for Union men. There are associated with us in this strike the Iron Moulders, Carpenters, Blacksmiths and Federation of Labor, who are standing true to their demand for fair treatment. Both firms are doing a limited amount of work with a class of help familiarly known as "scabs." Can you not see your way clear to give us some measure of assistance, other than in a financial way?

Trusting that you will do what you can to help us and extending to you our heartfelt gratitude for anything you may do, we remain,

Fraternally Yours."

To the above paper were appended, in type writing, the names of six local associations with the names of their respective presidents and secretaries, the defendant's heading the list, and in like manner the "Central Trades and Labor Council, C. W. Pennington, secretary," closing with the words: "Typographical Union Label, Rutland, Vt."

A considerable amount of testimony was introduced by the plaintiff, under the defendant's exception, tending to show various acts of intimidation by Martin to men who remained in the plaintiff's employment, and to new men who had been employed, and that he was active in the distribution of exhibit 3. The testimony of Tait, the defendant's secretary, tended to show that Martin was in Rutland in the summer of 1902 and was employed by, or at least acting for, the union in relation to the strike; that he was helping to keep men from working at the shops; that he was employed by Capeless and Newton, who were a committee of defendant lodge, and

that Martin was not a member of the lodge. The plaintiff claimed that the books and records would have shown that Martin was employed by the defendant to help conduct the strike, and the defendant claimed the contrary,—that he was not a member of defendant lodge, nor an employee of any committee of the lodge, and denied that the defendant appointed or authorized any committee to conduct the strike.

The rule of law that a person cannot prove his claimed agency by his own declarations does not apply to this case. The question is whether the plaintiff's evidence tended to show the conspiracy alleged.

To review the evidence briefly: The defendant was a local protection lodge of the International Association of Machinists, and it may be assumed that it was organized for the protection of the interests of its members who were machinists, a part of whom were in the plaintiff's employment. A strike from the Lincoln Iron Works, a corporation engaged in the same business as the plaintiff's, was made at the same time and by the same classes of workmen. The matter of the strike was brought up more than once at the meetings of the Council in the summer of 1902 by delegates from defendant lodge, who discussed and explained the situation. On May 11 the plaintiff received exhibit 2; on May 20 came the strike, and three hours later the plaintiff received exhibit 1. Both these papers bore the impress of the seal of the defendant. It is of no importance that it was not a corporation and that the seal was not a corporate seal. Its impress upon these papers was a circumstance proper to be considered with other evidence in the case tending to show that "The Committee" was a committee of the defendant, and that these papers emanated from it. The ten men who signed the second paper were all members of the lodge. Sheldon, who was one of the ten signers, procured type written copies of it to be made. That five of

these signers called upon the plaintiff's president two days later, one of their number saying to him that they thought he would like to see a committee, that they had come for an answer, and then making their demand, are facts that were proper for the jury to consider in connection with the denial of these men that they signed the paper or were authorized by the defendant to sign it.

The printed "stickers" were widely circulated in and about Rutland and in New York City, and exhibits 4 and 5, if not exhibit 3, were sent to the different machinists' lodges through the country for the obvious purpose of preventing other workmen from entering the plaintiff's employment while the strike was on.

It must have been common knowledge in Rutland that these great strikes were on, that the strikers were trying to prevent new men from entering the plaintiff's works, and that these circulars were distributed for that purpose. It is not conceivable that the defendant's officers could have been ignorant of these proceedings. The name of J. F. Tait, recording secretary, was appended to the circulars under that of C. F. Nourse as the defendant's president, and the jury might have inferred that the defendant directly or indirectly promoted the distribution of the circulars.

The evidence relative to the acts of Martin and McDonald tends as remotely as any evidence in the case to show that the defendant was a conspirator in the strike; yet secretary Tait testified that Martin, though not a union man, was employed by a committee and helping to prevent men from coming to work at the shops. The witness said, "not employed by the lodge particularly," but "by the committee."

McDonald had been in the plaintiff's employment until the strike. There was no evidence that he was a member of defendant lodge nor that he was employed by any one to

commit acts of violence; but, on the occasion testified to, there were present with McDonald, near the plaintiff's works, a crowd of about two hundred men, and some of the plaintiff's workmen were being detained by men in the crowd, and McDonald laid hold of one workman, threatened him and tried to draw him away. McDonald's acts and declarations alone were not admissible as tending to show the conspiracy alleged in the declaration, but if the other evidence in the case tended to show it, then his acts were properly shown as an incident in it, like evidence tending to show that the plaintiff's works were picketed by men unknown to the plaintiff's officers for the purpose of preventing new men entering the shops until the plaintiff had yielded to the demand for fewer hours of labor.

The testimony as to the doings of the mob on this occasion was received without objection, and this incident was only one of many introduced by the plaintiff tending to show intimidation of, and interference with, the plaintiff's workmen and men brought to Rutland by its agents for the purpose of filling the places of the strikers.

The testimony as to many of the other incidents referred to tended to show that the acts of intimidation and interference were committed by members of the defendant lodge and its agents and co-conspirators. Since these various incidents were concurrent in point of time, within the meaning of the law, and alike in adaptation to accomplish the general design of the conspiracy, they were all admissible as evidence tending to show that the participators were co-conspirators. The acts and declarations of McDonald at the time show that he understood the purpose of the mob and participated therein; hence the evidence tended to show that he was a co-conspirator, and there was no error in its admission. The authorities before referred to are full in support of this holding.

If McDonald engaged voluntarily in these unlawful acts; if he joined in with others to aid in the scheme, he became a co-conspirator, and the defendant was responsible for his acts, provided it were shown that the defendant was a conspirator with others, for the reason that McDonald's acts were in furtherance of the original design. "If a general conspiracy exists, you may go into general evidence of its nature and the conduct of its members, so as to implicate men who stand charged with acting upon the terms of it years after those terms have been established and who reside at a great distance from the place where the general plan is carried on. It is held that all who accede to a conspiracy after its formation and while it is being executed, become co-conspirators." * * *; also that if parties concur in doing the act, although they were not previously acquainted with each other, it is a conspiracy. See *King* v. *Hammond & Webb,* 2 Esp. Cas. 719.

The following extract from the opinion in *Spies* v. *People,* 122 Ill., 1, 3 Am. St. Rep., 320, is in point: "Nor is it necessary to prove that the conspiracy originated with the defendants, or that they met during the process of the concoction; for every person entering into a conspiracy or common design already formed is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design." 3 Greenl. Ev. § 93.

One to be chargeable need not have been an original contriver of the mischief; for he may become a partaker in it by joining the others while it is being executed. If he actually concurs, no proof is required of an agreement to concur. 2 Bish. New Crim. Law, § 190; 3 Chit. Crim. Law, § 1141, 1143; *People* v. *Mather,* 4 Wend. 229.

Where there is a conspiracy to accomplish an unlawful purpose, and the means are not specifically agreed upon or understood, each conspirator becomes responsible for the

means used by any co-conspirator in the accomplishment of the purpose in which they are all at the time engaged.

"The prosecutor may either prove the conspiracy which renders the acts of the conspirators admissible in evidence, or he may prove the acts of the different persons, and thus prove the conspiracy. Roscoe's Crim. Ev., 7th Ed., 415." See also *Stewart* v. *Johnson,* 18 N. J. Law, 87. Upon the same principle rest the Connecticut decisions, that any declaration made by one conspirator, pursuant to the common object and in furtherance of it, is admissible against all of them when the combination is once established. *Cowles* v. *Coe,* 21 Conn. 235; *Knower* v. *Clothing Co.,* 57 Id. 202; *State* v. *Thompson,* 69 Id. 720.

As we hold that there was some evidence tending to show the conspiracy alleged between the defendant and the Carpenters' Union, the testimony in relation to the action of Sanchegrin was admissible, which was in substance that he went out under promises from Howley who was a member of defendant lodge; that he went to the hall used by the defendant as a lodge room, and that he was there paid fifty cents by Howley which the latter received from Page.

The same reason applies to the testimony of Pennington in respect to his conversation with Loveland, also to the testimony of Patch as to his conversation with Young and Hines.

The defendant contends that all the evidence tending to show boycotting was inadmissible for the reason that the plaintiff could not recover damages for injuries thereby received by third persons. But we understand that the purpose of this evidence was to show that the plaintiff was directly injured to the extent to which the boycotting was carried into effect; for instance, if plumbers were not permitted to finish their work upon the boarding-house, the building could not be used for lodging and boarding the plaintiff's workmen; and

if stores were unable to supply the plaintiff's workmen with the necessaries of life, they could not continue in the plaintiff's employment, and thus the plaintiff was injured.

As all the testimony received under the defendant's exception, in our judgment, had some tendency to show the conspiracy claimed and the results of it and efforts made by the conspirators to make the strike effectual by preventing the plaintiff from employing other workmen, it cannot be insisted that there was error in respect to the order in the admission of evidence, for as was said in *Jenne* v. *Joslyn*, 41 Vt. 478, in the end all the evidence became pertinent to the issue. *Spies* v. *People.* The defendant's exceptions are not sustained.

II.   On the first day of the trial counsel for the plaintiff gave the counsel for the defendant a written notice requiring the defendant to produce its charter, its constitution and by-laws, its books of records containing the reports of meetings and records of resolutions and votes, the appointment of committees, a list of the members of defendant lodge from May 20, 1902, to the commencement of the suit, and a list of its charter members and the record book. On the following day the plaintiff's counsel stated in open court that he had served such notice upon defendant's counsel, and that the books and papers called for had not been produced. The defendant's counsel then said that he had no authority to produce any such books and papers, that he knew nothing about them, and that the defendant was a secret organization. The court admonished him that notice to him was notice to defendant. A subpoena *duces tecum* was also served upon John F. Tait, the defendant's recording secretary, who had charge of the books and records of the defendant, to bring into court all the records, record-books, paper accounts, charters, resolutions, votes and roll-books of the defendant. Tait appeared in court but brought with him none of the books, records or papers called

for. He stated that he had not read the subpoena and did not understand that he was required to produce the books and papers. He stated that he thought he could get them, and being excused by the court for that purpose, left the court-room but returned later stating that he had not got them, that they were not where he placed them two weeks before, and that the drawer where he kept them had evidently been opened and the books and papers taken out. The court there-upon ordered the defendant and its officers and agents to produce the books that had been called for, and stated the inferences that the law would draw from their non-production. Tait testified that he had had the custody of the books and records, and that the entire records had been taken away. On the day following this order the defendant's counsel was asked if he had the records in court, and he replied that he could only advise that they be produced, that he had so advised, and that he could not personally produce them. Later, Tait was asked if he had made inquiries of John E. Capeless, the defendant's treasurer, and replied that he had not, and had not seen him since the trial began. A few days later Mr. Nourse, the defendant's president, testified that he heard the demand made on the first day of the trial for defendant to produce its books and records, but that he had not seen or learned anything about them since, and that he had not seen the treasurer; that on that day he and Tait had made search in the hall and ante room and could not find the books and records. It was stated in court that a subpoena had been issued for Capeless, but that he could not be found, and the court held that the statement, in the circumstances, was proper. The plaintiff introduced Thomas Mullen as a witness whose testimony tended to show that he saw Charles T. Mc-Kean leave the machinists' hall a few nights before with a package about 14 x 10 inches and 2 inches thick, but that

he did not know what was in the package; that it had the appearance of a book; that he had not seen McKean since that night; that he had attended a meeting of defendant lodge about four weeks previous in the defendant's hall and saw there the roll-book and the book of minutes, and described them as about 10 x 14 inches and perhaps an inch thick; that he had attended meetings of the defendant, and that the minutes of the meetings were recorded in the minute book referred to.

Similar efforts were made to obtain from T. C. Young, the recording secretary of Local No. 950 of the Brotherhood of Carpenters and Joiners, the production in court of all the books and records of resolutions, votes, appointment of committees and records of proceedings of that association, but Young produced only the record book of proceedings since January 1, 1903. Mr. Blue, who preceded Young as secretary, and in whose custody Young testified the books and records were left, was ordered to bring such books and records into court, but he testified that Young was the secretary and had the custody of the books and records of the Carpenters' Union. Young was sent in the custody of an officer to the place where he said the books were, but he returned and said he had brought with him all the books and papers he had found in the drawer. He produced the record book from January to July, 1902, and plaintiff's counsel found among the papers a communication from the defendant dated May 31, 1902, announcing the strike and requesting the co-operation and assistance of the Carpenters' Union. This is plaintiff's exhibit 6. Young and Blue were afterwards directed to make further search, but reported that they were unsuccessful in finding the books and records demanded.

A like effort was made to have the books of record of the Central Trades and Labor Council produced. Pennington testified that the Council was composed of three delegates from

each of the several Unions in Rutland and vicinity; that he was then secretary of Protection Lodge, which was one of those unions; that he had not brought the records into court; that he had not the custody of them, and that he did not know where they were and had not seen them since he turned them over to McKean the previous December. The plaintiff's counsel stated in court that subpoenas had been issued for McKean and Capeless but had failed of service. A like effort was made to obtain the records, books and papers of the Journeyman Barbers' Union, 215, with the same result.

III. The court complied with twenty of the defendant's twenty-five requests, and exceptions are insisted upon here only to the refusal to charge in accordance with two of the remaining five, which were:

1. "That the plaintiff cannot recover for any expense incurred by it in procuring other workmen to take the position of the men who left its service on May 20, 1902."

2. "That any threat made by the defendant or anyone associated with it to boycott any boarding-house keeper who entertained or any merchant who supplied with the necessities of life workmen in the employ of the plaintiff, if made directly and exclusively to such boarding-house keeper or merchant, was not an interference with or invasion of the rights of the plaintiff, and for such threats the plaintiff cannot recover."

These requests were not sound in law. As to the first, the correct rule was given to the jury,—that so far as the plaintiff and the men whom it sought to employ to take the places of the strikers were left to their free choice, the plaintiff could not recover though it suffered damage; but the court said that the request ignored one of the vital questions in the case;—"Whether the plaintiff was hindered or impeded in procuring men to take the places of the strikers, and was so hindered and impeded by the defendant lodge or by those

with whom it was in conspiracy, whether individuals or associations, and whether men desiring employment and desirous and willing to work for the plaintiff for the wages which they were offered and on the terms which they were offered, as to hours, etc., whether these men were kept from entering into that employment by coercion or intimidation or undue influence operating either upon the mind or upon the body, that element seems to be omitted. That request in terms the court cannot comply with."

As to the other request the court properly remarked that it "could not say that it is not an invasion of the rights of a free man for others acting in combination to employ threats and intimidation (to use the language of the request); for one man not to supply him with one necessity of life, and another man not to supply him with another necessity of life. The court cannot lay down that doctrine."

IV. The defendant excepted to the compliance with the plaintiff's 10th request to charge, which reads:

"If the jury find the conspiracy charged in the declaration, and that other labor unions in the conspiracy suppressed, concealed or destroyed their records to prevent their being introduced in evidence, the same presumption of guilt may be drawn from such suppression of their records, and the jury may find the facts charged in the declaration established by the presumption arising from the suppression of the records of a co-conspirator." The court evidently used the word "damages" inadvertently, for the word "facts" was used in the request, which was given to the jury verbatim, with the exception of the change of these words and the omission of the words "of guilt" which the court said should be omitted. It is apparent that the court intended to comply literally with the request, and the jury could not have understood that if they made a certain presumption they were to find the damages

claimed in the writ, for the court had instructed them that the
burden of proof was upon the plaintiff to make out its case,
and after giving the plaintiff's 10th request it was explained
that the facts that men struck and went out, and that the
plaintiff thereby suffered damage, did not entitle it to re-
cover; that workmen might strike and go out and advise other
men who were inclined to take their places, not to do so. In
compliance with requests by both the plaintiff and the de-
fendant, the court repeatedly charged that the plaintiff could
not recover unless it showed that the injury suffered by it was
caused wholly, or in part, by the the unlawful act of the de-
fendant, or of some or all of the associations or persons con-
nected with it; that some unlawful means must have been
used—an interference with or invasion of the legal rights of
the plaintiff; that intimidation and coercion, either physical
or moral, must have been employed by the defendant, or by
others in the unlawful combination, to entitle the plaintiff to
recover damages. The entire charge, except the expression
referred to, was in accordance with the settled rules of law
upon the subject of damages in such cases, and the jury could
not have been misled. The use of the word "damages" by
the court was so inconsistent with the theory of the entire
charge upon the subject of damages, that we think it was the
duty of counsel to have called the attention of the court to
it. It was said by Veazey J., in *Melendy* v. *Bradford,* 56 Vt.
148: "When a judge drops a word or expression, in the
course of a long charge, contrary to its whole theory and so
plainly error as to force the impression of inadvertence, it is
the duty of counsel to call attention to it and not let it pass
in reliance upon a general exception in the event of an ad-
verse verdict;" and by Rowell, J., in *Fassett* v. *Roxbury,* 55
Vt. 552: "It is not profitable or salutary to look into a charge
with a carping disposition, but it should be taken as a whole;

and although it may contain some expressions that, taken alone, would be error, yet if, as a whole, it breathes the true spirit and doctrine of the law and there is no fair ground to say that the jury has been misled by it, it ought to stand."

The 10th request and instruction were correct. In 3 Greenl. Ev. § 94 the rule is laid down that: "The principle on which the acts and declarations of other conspirators, and acts done at different times, are admitted in evidence against the persons prosecuted, is, that, by the act of conspiring together, the conspirators have jointly assumed to themselves, as a body, the attribute of individuality, so far as regards the prosecution of the common design; thus rendering whatever is done or said by any one in furtherance of that design, a part of the *res gestae,* and therefore the act of all." See *State* v. *Thibeau,* 30 Vt. 100; 2 Russ. on Cr., Metc. ed., 572.

The fact of a common design, of an individuality of purpose existing between the different associations, provided the conspiracy were established, made the records of the other associations the records of the defendant. · As the act of one co-conspirator was the act of all, so the records of one association were the records of all so far as they evidenced the unlawful combination. Indeed, no claim is made in the defendant's brief or argument that the other associations stood differently from it in respect to the non-production of their books and papers.

V. The plaintiff's evidence had tended to show that the defendant, having control of the books and papers called for by the plaintiff and ordered by the court to be produced, had refused to produce them in defiance of the order; that the reasons given for their non-production were frivolous and derisive; that the defendant and its officers stood before the court in the attitude of men who had spoliated or suppressed

evidence. The question is whether the court applied the correct rule of law in the instructions to the jury.

In charging upon this subject the court stated without objection that it had been shown that the defendant "had books, books of minutes," and that was treated as a fact in the case. The court, however, did not assume as a fact that the defendant might have produced the books, records etc., called for, but submitted that question to the jury. This language was used in the charge: "But you can easily see that if books are destroyed; if books are hidden; if books are carried away, the power of the court is limited in that respect; * * * But the arm of the law is long enough and strong enough to reach cases of that sort, and when the jury feel in a civil case, when they are satisfied by a fair balance of proof, fair balance of probabilities, that a party has suppressed books, has hidden books, has kept books away that have been called for and which it has had notice to produce, then the law says the jury may presume from the absence of those books and papers against the party called upon to produce them, and not producing them, and in favor of the other party." Further on the court said: "If you find that the defendant, after being notified to produce books and papers, has failed to do so, you have a right to presume that it is because those books and papers would make against its claim and in favor of the claim of the plaintiff" * * *. "You can give to that presumption such weight as you think it ought to have. You may find or presume that the claim of the plaintiff is true and that the claim of the defendant is false, is untrue, if you find that the defendant has suppressed evidence which has been duly called for. In the view that the court takes of the matter, the weight of it rests with you." To these instructions the defendant excepted. (We think that, in the connection in which

it was used, the word "failed" was equivalent to *refused,* having the power to obey the order.)

The defendant contends that this was a literal application of the doctrine of *omnia praesumuntur in odium spoliatoris;* that the remarks of the court above quoted amounted to an instruction that, if the jury found that the books had been destroyed or suppressed, they might presume, without other proof of the fact, that they contained evidence of the conspiracy. The jury could not have so understood it, for immediately after the above instructions were given the court explained what the claims of the parties were,—the plaintiff's, that there had been coercion and intimidation resulting in damages,—the defendant's, that it had only advised but made no attempt to interfere with the free choice and judgment of workmen. The court then remarked that the jury knew what the claims and evidence were on both sides and that he would not undertake to review the evidence in full. After thus stating the question to the jury, he told them that they must "consider what had been produced in evidence; that they knew the history of the case." He called attention to the fact that the defendant had not produced the books of the association after repeated notice to produce them—after it was shown that it had them; also to the "stickers" and circulars, and submitted to the jury to find whether they were signed by authority of the associations, whether the different associations were associated together, and, if these facts were found, whether these "stickers" and circulars fairly represented the circumstances and situation at Rutland. In calling attention to different parts of the evidence the court repeatedly said to the jury: "It is for you to say." In complying with several of the defendant's requests, he charged, as before stated, that to entitle the plaintiff to recover, he must prove that he was

injured by some unlawful act of the defendant or its associates.

Taken together this fairly shows that the court charged the jury that if they found the defendant had suppressed the books and papers, they might find or presume the plaintiff's claim upon the evidence was true, and that the defendant's claim was false. It cannot be fairly said that the jury must have understood it to mean otherwise. If this is the fair meaning of the charge, and we think it is, the jury are presumed to have so understood it, and there was no error.

The rule of law governing this question was substantially complied with, which is, that the presumption arising from the fact of spoliation of evidence does not relieve the other party from introducing evidence tending affirmatively to prove his case so far as he has the burden. It cannot supersede the necessity of other evidence. The presumption is regarded as merely matter of inference in weighing the effect of evidence in its nature applicable to the question in dispute. *Arbuckle* v. *Templeton,* 65 Vt. 205, 25 Atl. 1095.

VI. After verdict and before judgment the defendant filed a motion that the verdict be set aside and a new trial granted by reason of the misconduct of a juror during the trial. Testimony was taken on both sides and the motion was fully heard by the trial court upon the testimony submitted and the motion was denied. The court filed no statement of facts, and, therefore, under the decision in *Mullin* v. *Rowell,* 56 Vt. 301, the question is not before this court.

*Judgment affirmed.*

*Start,* J. dissents, holding that the exceptions to the charge should be sustained.