ROGERS et al. v. VICKSBURG, S. & P. R. CO.†

(Circuit Court of Appeals, Fifth Circuit. March 5, 1912.)

No. 2,265.

1. Corporations (§ 496*)—Liability for Torts—Conspiracy.
  Corporations are liable in damages for torts, and in proper cases may be convicted of conspiracy.

  [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1907; Dec. Dig. § 496.*

  Liabilities of corporations for conspiracy, see note to Hindman v. First‑Nat. Bank, 39 C. C. A. 17.]

2. Conspiracy (§ 21*)—Civil Liability Action—Questions for Jury.
  In an action against a railroad for aiding in a conspiracy to commit a lynching by furnishing a special train to carry the individuals composing the mob to the place where the lynching took place, evidence examined, and held that it was error to direct a verdict for defendant.

  [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 28, 29; Dec. Dig. § 21.*]

In Error to the Circuit Court of the United States for the Southern District of Mississippi.

Action at law by Annie May Rogers and others against the Vicksburg, Shreveport & Pacific Railroad Company. Judgment for defendant, and plaintiffs bring error. Reversed.

This is a suit by the widow and minor children of Robert T. Rogers, who was taken by a mob from the parish jail at Tallulah, La., on May 28, 1906, and hanged. Rogers was accused of murdering a man by the name of Brown and was about to go free, a plea of former jeopardy having been sustained, when, on the day mentioned, the brother of Brown chartered from defendant in error a special train, which was run from Monroe, La., to Tallulah, and gathered up along the way the individuals composing the mob that broke into the jail and hanged Rogers.

———————
*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied April 2, 1912.

There are four counts to the declaration. The first is based on the theory that a conspiracy existed to take the life of Rogers, and the defendant company joined the same, and thereby became liable for all of the acts of any of the conspirators. The second count proceeds upon the theory that the defendant had or was charged with notice of the fact that the special train was chartered for an unlawful purpose, and that it was defendant's duty not to place at the disposal of the mob the means of accomplishing its purpose, which duty it violated. The third count charges negligence in not preventing the carrying out of the unlawful scheme; it being the duty of the defendant and within its power to do so. And the fourth count charges that the defendant, having delegated its franchise powers and privileges to another, cannot escape liability, but is responsible for his acts.

To this declaration the defendant pleaded the general issue, a jury was impaneled, and testimony introduced by the plaintiffs tending to show the following facts:

On May 28, 1906, Robert T. Rogers, the deceased, was being held a prisoner in the parish jail at Tallulah, La., on the charge of murdering a man by the name of Brown. A plea of former jeopardy had been interposed in his behalf, and on the 21st of the same month the plea had been sustained and the discharge of the prisoner ordered; but he was being held subject to an appeal by the state from this decision.

The man whom Rogers was accused of having killed had a brother residing in Monroe, La., and on said May 28th, one week after the order was made discharging Rogers, this brother, "Doctor" F. A. Brown, made application to the defendant company to lease or charter to him a special train to be run from Monroe to Delta Point, the eastern terminus of its road, and return; Tallulah being a station on its road between these places. The application for this train was made to M. M. Bellah, ticket agent of defendant at Monroe, about 10 o'clock in the forenoon for a train to be started from Monroe at 8:30 o'clock that night and run to Delta Point, where it was to remain about four hours and then return to Monroe. Dr. Brown stated to Bellah that he wished to carry three or four passengers and make stops at Rayville Railroad Crossing, Boeuf River, and Delhi, and that it would suit him as well to have the train leave Monroe from the switching yard as from the depot; the yard being about half a mile east of the depot. As soon as the application was made, Bellah took the matter up by wire with the superintendent at Vicksburg, and a number of telegrams passed, resulting in the chartering of the train and fixing of the price. Although there were two regular passenger trains a day each way between these points and this train was to be run at such unusual hours, no inquiry was made as to the purpose for which Dr. Brown wished to charter it. The disposition of the Rogers' case at Tallulah had aroused much interest in and about Monroe, and it was a matter of general knowledge and discussion on said day that this special train was to be run that night. One of the citizens who had heard the rumor walked down with a friend to the yard about the appointed time and observed the train standing in readiness and saw a number of men crawl from under the neighboring box cars and get on board, carrying guns, sacks, ropes, chains, and lanterns; one of the latter having a sack or gauze around it. They seemed to be in a great hurry. The lights on the coach were turned low and the window shades drawn down, and the men conversed in subdued tones, so that this witness could not hear what was being said. The point from which the train was started was about 60 yards from the Monroe yard office, where telegraphic messages are received and sent in connection with the running of trains. This train left about 8:30 p. m. and proceeded eastward, stopping first at the Boeuf River water tank, next at the Rayville railroad crossing, then at a point several miles east of Rayville, out in the woods, where there was no station nor even a switch. The next stop was at the compress at Delhi, and the next at the Delhi depot, where a red semaphore required it to stop for orders. The conductor remained for several minutes in the telegraph office at Delhi and received orders from the chief train dispatcher's office at Vicksburg. The train then proceeded to the Bayou Macon bridge, where another stop was made. At all of these points, except the Delhi station, additional armed men boarded the train. The flagman is the only mem-

ber of the train crew whose testimony was procured by plaintiffs, and he states that the lights in the coach were turned low, though he does not know who turned them down; that he noticed the guns soon after the train left Monroe and thought that "something was up," though he could not tell what; that his suspicions were aroused; that the shades at the windows were drawn down, and it was too dark in the car to recognize any one; that he saw Dr. Brown and the conductor, Mr. James (who is now dead) conversing on the back platform for a part of the way, though he did not hear what was said between them. He describes the stops that were made and the taking on of the additional men, and says that when they reached Tallulah (53 miles from Monroe) there were 40 or 50 men on board; and there the train stopped immediately in front of the courthouse, which was the nearest point to the jail that it could reach, and everybody got off except the train crew and went to the north side of the track (the side on which the jail is located). That the train then went on to Delta Point, reversed, and immediately returned to Tallulah.

No one in Tallulah, as far as the testimony shows, saw the mob leave the train; but the latter was observed to stop in front of the courthouse, and a few minutes afterwards the citizens were aroused (it being then about 10 o'clock at night or later) by hammering and pounding at the jail and the cries of Rogers pleading for his life. Entrance was finally effected through the brick wall of the jail, and the lock of the steel cage was cut off and Rogers removed in his night clothes and sock feet and taken by the mob to a point on the defendant's right of way several hundred yards west of its passenger depot and there hanged to a telegraph pole.

When the train was returning and had reached Barnes, a station four miles east of Tallulah, it was met by a freight train, the crew of which told Conductor James that the mob had hanged a man at Tallulah. The train proceeded to Tallulah and stopped in front of the courthouse, at the point where the mob had left it, but, failing to find its passengers, felt its way along to the depot, where it was temporarily stopped by the sheriff's posse, but shortly permitted to go on. From the depot platform, where he, with others, had stood and watched the hanging, Mr. J. V. Sevier pointed out to the conductor the mob on the railroad at the point where the hanging had taken place, "giving him the highball" to come on down. He "rode the engine," by the headlight of which the body could be seen hanging to the pole, stopped his train at the scene of the lynching, and took on board the perpetrators of the crime and returned them to the several points from which they had come.

The chief train dispatcher of the defendant road, whose office is at Vicksburg, testified that the orders given the crew of this train were to make stops as requested by Dr. Brown and to observe his wishes in the running of the train, as it was chartered by him.

Robert T. Rogers was a young man only 30 years of age at the time of his death, was a devoted husband, a kind and loving father, and a good provider for his family.

At the close of the plaintiffs' testimony, the defendant moved the court to exclude the same from the jury and instruct them to find a verdict for the defendant, which motion was sustained and the jury so instructed, and verdict was rendered accordingly.

From the judgment on the verdict, this writ of error was sued out.

J. C. Bryson (J. B. Dabney, J. B. Stone, and W. M. Murphy, on the brief), for plaintiffs in error.

J. Blanc Monroe and J. Hirsh (Hirsh, Dent & Landau, on the brief), for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts as above). This suit is one to recover damages from the defendant railroad company for aiding, assisting, and participating in the unlawful conspiracy to

murder Robert T. Rogers, the husband and father of plaintiffs below, plaintiffs in error here.

Article 2315, C. C. La., provides as follows:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it; the right of this action shall survive in case of death in favor of the minor children or widow of the deceased or either of them, and in default of these, in favor of the surviving father and mother or either of them, and for the space of one year from the death. The survivors above mentioned may also recover the damages sustained by them by the death of the parent or child, or husband or wife, as the case may be."

[1] Corporations are liable in damages for torts, and in proper cases may be convicted of conspiracy.

[2] The evidence shows that a conspiracy to lynch Rogers existed, and that in pursuance thereof Rogers was lynched, and that the successful result of the conspiracy came through the aid and assistance given by the company and its agents; for it is undisputed that the company furnished the railroad train which gathered up the individuals composing the mob, carried them for miles to Tallulah, La., landed them near the jail in which Rogers was confined, and after the murder came back to the scene, gathered up the members of the lynching party, and carried them away in and to safety.

Is the railroad company liable, under the laws of Louisiana, for the unlawful act resulting in damages to Rogers' wife and children? Did the company's agents know, or ought they to have known, at any time previous to the landing of the mob at Tallulah, the object and the purposes of the gathering and the hiring of the special train?

Under the evidence, mainly recited in the foregoing statement, these questions can only be answered by a jury.

The railroad company was present throughout by its authorized agents, and, if the witnesses are to be believed, those agents knew, or ought to have known, long before the special train reached Tallulah, that the object and purposes of the trip were unlawful.

"Every person entering into a conspiracy already formed is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design.

"One to be chargeable as a co-conspirator need not have been an original contriver of the mischief, for he may become a partaker in it by joining the others while it is being executed. If he actually concurs, no proof is required of an agreement to concur.

"If there is a conspiracy to accomplish an unlawful purpose, and the means are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any co-conspirator in the accomplishment of the purpose in which they are all at the time engaged.

"In an action against co-conspirators, the prosecutor may either prove the conspiracy which renders the acts of the conspirators admissible in evidence, or he may prove the acts of the different persons, and thus prove the conspiracy." Patch Mfg. Co. v. Protection Lodge, 77 Vt. 294, 60 Atl. 74, 107 Am. St. Rep. 765.

"Mr. Cooley on Torts (page 125), referring to a conspiracy, says: 'When the mischief is accomplished, the conspiracy becomes important, as it affects the means and measures of redress; for the party wronged may look beyond the actual participants in committing the injury, and join with them as defendants all who conspired to accomplish it. The significance of the conspiracy consists, therefore, in this: That it gives the person injured a remedy

against parties not otherwise connected with the wrong.' At page 127: 'Most wrongs may be committed either by one person or by several. When several participate, they may do so in different ways, at different times, and in very unequal proportions. One may plan, another may procure the men to execute, others may be the actual instruments in accomplishing the mischief; but the legal blame will rest upon all as joint actors.' And at page 133: 'Where several persons unite in an act which constitutes a wrong to another, intending at the time to commit it, or doing it under circumstances which fairly charge them with intending the consequences which follow, it is a very reasonable and just rule of law which compels each to assume and bear the responsibility of the misconduct of all. To require the party injured to ascertain and point out how much injury was done by one person, and how much by another, or what share of responsibility is fairly attributable to each, as between themselves, and to leave this to be apportioned among them by the jury according to the mischief found to have been done by each, would in many cases be equivalent to a practical denial of justice. * * * While the law permits all the wrongdoers to be proceeded against jointly, it also leaves the party injured at liberty to pursue any one of them severally, or any number less than the whole, and to enforce his remedy, regardless of the participation of the others.'" Kernan v. Humble, 51 La. Ann. 389, 25 South. 431.

The judgment of the Circuit Court is reversed, and the cause is remanded with instructions to award a new trial.