Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio




# OPINION

No. 04-09-00043-CV

**U.S. RENAL CARE, INC.**,
Appellant

v.

Laura **JAAFAR**, Lisa Lewis, and Bob A. Ehl,
Appellees

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CI-02320
Honorable Joe Frazier Brown, Jr., Judge Presiding

### OPINION ON MOTION FOR REHEARING

Opinion by:    Rebecca Simmons, Justice

Sitting:    Phylis J. Speedlin, Justice
Rebecca Simmons, Justice
Steven C. Hilbig, Justice

Delivered and Filed:  March 30, 2011

AFFIRMED IN PART; REVERSED AND RENDERED IN PART

The appellees' motion for rehearing is denied.  This court's opinion and judgment dated December 8, 2010 are withdrawn, and this opinion and judgment are substituted.  We substitute this opinion to clarify our judgment.

This case stems from a dispute regarding Appellant U.S. Renal Care's (Renal Care) purchase of Rencare, Ltd., formerly owned by Appellees Laura Jaafar, Lisa Lewis, and their

father, Bob Ehl (collectively Sellers). Jaafar and Lewis sued Renal Care for breach of contract, violation of prompt payment statutes, and attorney's fees, among other claims. Renal Care counterclaimed for breach of contract and sued third party defendant Ehl for breach of contract and fraud. Following a jury trial, the trial court entered a final judgment in favor of the plaintiffs on the jury's verdict in the amount of $750,000.00 in damages, $300,000.00 in attorney's fees for trial, and prejudgment interest of $68,938.36. In addition, a conditional award of $375,000.00 in appellate attorney's fees was granted. A take-nothing judgment was entered on Renal Care's counterclaims against the plaintiffs and its third party claim against Ehl. The only portion of the judgment challenged on appeal is the award of damages, interest, and attorney's fees to Jaafar and Lewis. Because we conclude there is no evidence to support the jury's award of damages and, consequently, no right to attorney's fees, we reverse the judgment as to the award of damages, interest, and attorney's fees and render a take-nothing judgment in favor of Renal Care with regard to Jaafar and Lewis's claims. The remaining portions of the judgment which have not been challenged on appeal are affirmed.

## BACKGROUND

Bob Ehl started Rencare, which owned and operated several dialysis clinics in and around San Antonio. In 2006, Renal Care contacted Ehl, Jaafar, and Lewis regarding the purchase of Rencare, and ultimately the parties entered into an agreement. The Sale Agreement (also referred to as the Stock Purchase Agreement (Agreement)) stated Renal Care would acquire 100% of the stock in Rencare, but Sellers would retain all accounts receivable for services rendered by Rencare prior to the closing date of February 23, 2006. Following the sale, a

controversy arose over the accounting for the pre-sale receivables, and Sellers sued Renal Care for breaching the Agreement specifically as it pertained to the pre-sale accounts receivable.[1]

At trial, Sellers asked the jury to find that Renal Care breached at least one of three specific sections of the Agreement: (1) Section 6.13, by failing to promptly pay to Sellers funds received in payment of services provided by Rencare prior to the Agreement; (2) Section 6.06, by failing to pay Sellers any balance due from any third party payors pertaining to services rendered by Rencare prior to closing; and (3) Section 6.11, by failing to provide documents, data, and software pertaining to the retained accounts receivable to Sellers.

## A. Prior to Closing

This case focuses on the Sellers' retained accounts receivable and a perhaps tedious, but thorough, discussion of the accounts receivable is necessary to understand the nature of the parties' dispute. A pre-sale audit was completed in November 2005 that calculated the value of Rencare's receivables as of September 30, 2005. From its opening in 1997, Rencare had maintained its books on a cash basis and never wrote off uncollectable receivables. The amount of receivables on Rencare's books in 2005 totaled approximately $22 million, but only an unknown fraction was collectable. For these reasons, the auditors were unable to rely on Rencare's books and, therefore, had to develop a method capable of determining a reasonable value for the collectable accounts receivable.

To determine the amounts that were actually collected for the services performed prior to December 31, 2004, the auditors first looked at the services rendered prior to December 31, 2004, and the collection history for those services during the following eleven-month period. Based on the eleven-month period, the auditors determined that virtually all payments received

---

[1] The Sellers' pre-sale accounts receivable are sometimes referred to as the retained accounts receivable.

by Rencare were collected within sixty days of the date of the bill. Using this method, the auditors developed an accounts receivable figure as of December 31, 2004. The auditors then looked at the sixty-day period following September 30, 2005, to determine the value of Rencare's receivables as of September 30, 2005. The estimated collectible receivables, as of September 30, 2005, totaled approximately $1.011 million. This accounts receivable value was inserted into the final financial statements attached to the Agreement.

Because the audit was effective as of September 2005, and the sale was not finalized until February 2006, Renal Care sought assurance that no substantial change had occurred in Rencare's business during the interim months, including the value of its receivables. In response, the auditors prepared a management representation letter that Ehl signed on behalf of Rencare. This letter provided that no material change had occurred in the condition of the business, and acknowledged the accuracy of the accounts receivable as recorded at December 31, 2004, and September 30, 2005.

## B. After Closing

The Agreement required Renal Care to promptly pay Sellers any funds received by Renal Care attributable to Rencare's pre-sale services. It also required Renal Care to keep former Rencare office employees on staff for ninety days following the closing date, thus allowing them to collect the bills already sent. During this time, the Rencare staff worked the outstanding claims, and Sellers ultimately collected $1.4 million in pre-sale receivables. After the ninety days passed, the former Rencare employees were discharged and Renal Care moved many of Rencare's computers, files, and boxes to various locations. As to the receivables remaining after ninety days, Renal Care asserts that it provided Ehl with both a CD-ROM of the Med Bill software and the Med Bill claims file required to work the files and collect the remaining pre-

sale receivables owed to Rencare. Ehl, however, strongly disputes his receipt of all the information necessary for continued collection efforts.

Because the Sellers retained the right to be paid for their pre-sale services, the accounting of proceeds collected after the sale became critical. Following the sale, Renal Care received payments from third party payors for pre-sale services provided by Rencare. The payments to Sellers and other amounts still owed from Sellers were displayed on spreadsheets created by Renal Care. These spreadsheets, or "true-ups" as they were named, were sent to Sellers on a weekly basis, along with a check and copies of underlying documentation. Sellers began voicing concerns regarding the true-up system of offsetting money owed by Rencare to Renal Care with payments received by Renal Care for services rendered by Rencare.[2] Additionally, Sellers, and specifically Ehl, frequently complained that the disorganization, and lack of itemization contained in the documentation, made the true-ups confusing. Ehl sent Renal Care a letter alleging that based on discrepancies found between true-ups, he calculated that approximately $260,000.00 was owed to Rencare. Ehl's demand letter stated, "[W]e want to look at Rencare's books and all bank accounts to confirm the total amount of [accounts receivable] collected since February 23, 2006, and the amounts due each party."[3] Dissatisfied with Renal Care's lack of payment, Sellers subsequently filed suit.

Upon notice of suit, Renal Care hired an accountant to examine Renal Care's books and determine what monies, if any, were still owed to Sellers under the Agreement. The accountant, Mark Schwartz, determined that $4,400.00 was still owed, and Renal Care promptly paid this amount to Sellers. At trial, Renal Care asserted all the monies owed to Sellers had been paid. Rencare offered a different picture. Their expert, Gene Trevino, opined that the retained

---

[2] At trial several Renal Care employees confirmed the Agreement did not provide for offsets.
[3] Sellers sent an auditor to Renal Care to reconcile amounts owed; however, he did not testify at trial and the results of his audit are unknown.

accounts receivable that could have been collected totaled over $2.3 million. By including interest and prompt payment penalties, Trevino arrived at a damage figure of $2,787,157.21. During closing argument, Sellers' attorney offered an additional damage figure, encouraging the jury to award $22,359,502.29, representing the balance calculated from two trial exhibits.

At trial, the various breach of contract allegations were submitted as one question for the jury: "Did [Renal Care] fail to comply with the [Agreement] dated February 23, 2006?", to which the jury answered "Yes." The jury then returned a verdict awarding $750,000.00 in damages, $300,000.00 in attorney's fees for trial, and prejudgment interest of $68,938.36. In addition, a conditional award of $375,000.00 in appellate attorney's fees was granted. Renal Care argues on appeal: (1) the evidence is legally insufficient to show a material breach of the Agreement, (2) the trial court erroneously admitted the expert testimony, (3) the evidence is legally insufficient to support the damage award, and (4) the evidence is legally insufficient to support the award of attorney's fees. We first address Renal Care's issues pertaining to the damage award, including the expert opinion on damages.

## EXPERT TESTIMONY REGARDING DAMAGES

Sellers relied on the expert testimony of Gene Trevino to support their damage award. Renal Care complains that Trevino's testimony was inadmissible based on his lack of qualifications and his unreliable damage model.[4] If Trevino's testimony is excluded, Renal Care argues that there is no evidence to support the damage award. The Sellers respond (1) that Trevino is a qualified expert under Texas Rule of Evidence 702, (2) that his methodology is reliable, and (3) that even if Trevino is excluded, there was other evidence sufficient to support the damage award. Because Trevino's methodology and assumptions were unreliable, we

---

[4] The trial court conducted a pre-trial hearing on the admissibility of Trevino's testimony and determined that Trevino was qualified and his methodology reliable. At trial, Renal Care moved for a directed verdict arguing that Trevino's testimony was unreliable and, therefore, the plaintiffs presented no evidence of damages.

conclude that the trial court abused its discretion in admitting his testimony, and Trevino's testimony provides no evidentiary support for the damages found by the jury.

## A. Standard of Review—Admissibility of Expert Testimony

Texas Rule of Evidence 702 permits a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" to "testify . . . in the form of an opinion or otherwise" when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. A two-prong test governs whether expert testimony is admissible: (1) the expert must be qualified, and (2) the testimony must be relevant and based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex. 1995). "If the expert's scientific testimony is not reliable, it is not evidence." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 713 (Tex. 1997). Generally, courts review a challenge to the admission of expert testimony under an abuse of discretion standard. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009).[5] "But a party may assert on appeal that unreliable scientific evidence or expert testimony is not only inadmissible, but also that its unreliability makes it legally insufficient to support a verdict." *Id*.; *see Goodyear Tire & Rubber Co. v. Rios*, 143 S.W.3d 107, 113 (Tex. App.—San Antonio 2004, pet. denied). In a no-evidence review, an appellate court considers "whether the evidence at trial would enable reasonable and fair-minded [jurors] to reach the verdict." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). "[A] no-evidence review encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable." *Whirlpool*, 298 S.W.3d at 638 (citing *City of Keller*, 168 S.W.3d at 814).

---

[5] "Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006).

Expert testimony is unreliable if it is based on unreliable data, or "if the expert draws conclusions from [his underlying] data based on flawed methodology." *Merrell Dow Pharm.*, 953 S.W.2d at 714. Likewise, "[e]xpert testimony lacking a proper foundation is incompetent, *City of Keller*, 168 S.W.3d at 813, and its admission is an abuse of discretion." *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239 (Tex. 2010) (citing *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006)). Expert testimony is also unreliable if "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "The court's ultimate task, however, is not to determine whether the expert's conclusions are correct, but rather whether the analysis the expert used to reach those conclusions is reliable and therefore admissible." *TXI Transp. Co.*, 306 S.W.3d at 239 (citing *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002)). Once an opposing party objects to proffered expert testimony, the proponent of the witness's testimony bears the burden to demonstrate its admissibility. *See Gammill*, 972 S.W.2d at 718.

## B.  Trevino's Qualifications

Renal Care first contends the trial court erred in denying its motion to exclude Trevino's testimony because Trevino was not qualified to give an opinion as to the value of the retained accounts receivable owed to Rencare. Because no bright-line test exists to guide us as to whether a particular witness is qualified to testify as an expert, we focus instead on "whether the expert's expertise goes to the very matter on which he or she is to give an opinion." *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996); *see also Helena Chem. Co. v. Wilkins*, 18 S.W.3d 744, 752 (Tex. App.—San Antonio 2000), *aff'd*, 47 S.W.3d 486 (Tex. 2001).

Renal Care lists the following reasons why Trevino is unqualified to testify to a damage figure based on healthcare billing: (1) although Trevino has his bachelor's and master's degrees, they are in the field of finance, not accounting, and his Ph.D. is from an online university; (2) although he is a Certified Financial Analyst, this is an investment advisor certification and he is not certified as a Certified Public Accountant; (3) he has published no peer reviewed articles and his non-peer reviewed articles deal with being an expert witness; and (4) he has no training or experience concerning insurance practices or healthcare billing. Sellers respond that Trevino has the following background that makes him qualified to testify regarding unpaid accounts receivable: (1) the above listed degrees; (2) a publication in a non-peer reviewed journal; (3) his experience valuing businesses for twenty years; (4) his understanding of the Medicare payor system; and (5) his accreditations as a credit senior appraiser from the American Society of Appraisers.

Trevino holds a bachelor's degree in finance and a master's degree in business from the University of Texas at San Antonio. He received a Ph.D. from Walden University, a distance learning center. Trevino testified to extensive experience in valuing businesses over the preceding twenty years. He explained that in the normal course of a business valuation the biggest asset is often "the accounts receivable—or what money people owe them." He described his experience in valuing several physician practices, clinics, ambulatory surgery centers, home health care agencies, nursing agencies, and physical therapy businesses involving a valuation of their accounts receivable. The majority of these valuations, however, were for non-litigation purposes. He is also accredited as a "credit senior appraiser" as conferred by the American Society of Appraisers and has taught courses on their behalf.

We, therefore, conclude that Trevino's qualifications are based on specialized knowledge, skill, and experience in the area in which he offered testimony. *See Helena Chem. Co.*, 18 S.W.3d at 752. Thus, the trial court did not abuse its discretion in permitting Dr. Trevino to testify as an expert on Rencare's damages. *See Broders*, 924 S.W.2d at 153. We now turn to Trevino's opinion and the second prong of *Robinson*.

## C. Trevino's Methodology

*Robinson*'s second prong requires courts to assess whether the expert's methodology is relevant and based on a reliable foundation. *Robinson*, 923 S.W.2d at 556. In *Robinson*, the court identified factors to determine whether an expert's testimony is reliable, and thus admissible. *Id.* at 557.[6] Renal Care argues that Trevino's methodology is deficient under *Robinson*. The Sellers respond that the *Robinson* factors are irrelevant, and the reliability of Dr. Trevino's opinion is properly measured by the less rigorous "analytical gap" test. *See Gammill*, 972 S.W.2d at 726–27.[7] Rather than focus on a fixed test, the Texas Supreme Court has applied a more flexible approach:

> In determining whether expert testimony is reliable, a court may consider the factors set out by the Court in *Robinson* and the expert's experience. However, in very few cases will the evidence be such that the trial court's reliability determination can properly be based only on the experience of a qualified expert to the exclusion of factors such as those set out in *Robinson*, or, on the other hand, properly be based only on factors such as those set out in *Robinson* to the exclusion of considerations based on a qualified expert's experience.

---

[6] These factors include, but are not limited to:

    (1) the extent to which the theory has been or can be tested;

    (2) the extent to which the technique relies upon the subjective interpretation of the expert;

    (3) whether the theory has been subjected to peer review and/or publication;

    (4) the technique's potential rate of error;

    (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

    (6) the non-judicial uses which have been made of the theory or technique.

*Robinson*, 923 S.W.2d at 557 (internal citation omitted).

[7] Under the analytical gap approach, the focus is on the experience of the expert and an examination of whether there is "too great an analytical gap between the data and the opinion proffered." *Gammill*, 972 S.W.2d at 727.

*Whirlpool Corp.*, 298 S.W.3d at 638 (internal citation omitted).[8]  "[A] trial court should consider the factors mentioned in *Robinson* when doing so will be helpful in determining reliability of an expert's testimony, regardless of whether the testimony is scientific in nature or experience-based." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 579 (Tex. 2006).

Irrespective of the test applied, in its gate-keeping function, "courts are to rigorously examine the validity of facts and assumptions on which the testimony is based, as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodologies are applied by the expert to reach the conclusions." *Whirlpool*, 298 S.W.3d at 637.  An impermissible analytical gap exists if an expert "has offered nothing to suggest that what he believes could have happened actually did happen," because, in that case, "[h]is opinions are little more than 'subjective belief or unsupported speculation.'" *Gammill*, 972 S.W.2d at 728 (emphases omitted) (quoting *Robinson*, 923 S.W.2d at 557).  "It is not so simply because an expert says it is so." *Merrell Dow Pharm.*, 953 S.W.2d at 712 (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421 (5th Cir. 1987)).  Bearing these precepts in mind, we review the testimony of Dr. Trevino.

### 1. Trevino's "Balance Sheet" Method of Calculating Accounts Receivable

Trevino testified that the currently unpaid balance of accounts receivable Renal Care owed to Rencare was $2,350,691.00 and that with interest and penalties the total amount of damages amounted to $2,787,157.27.  Trevino explained that his calculation was "very straightforward: I just took a percentage of what's been paid on the amount billed in the past and applied that percentage to the amounts outstanding."  Trevino called his method the "Balance

---

[8]  "An expert's opinion might be unreliable, for example, if it is based on assumed facts that vary from the actual facts . . . ." *Whirlpool*, 298 S.W.3d at 637.  "Further, each material part of an expert's theory must be reliable." *Id.*

Sheet Approach," which involved looking at Rencare's historical experience in collecting receivables and applying that experience to current outstanding amounts.

Trevino testified, that in terms of data, his opinion is based solely on two reports known as the "44-page report," the non-Medicare or private pay report, and the "77-page report," or Medicare report (collectively Reports). The Reports identify the patients receiving services from January 2005 to the date of sale, February 23, 2006.[9] The Reports list Rencare's patients followed below by their data contained in several columns including: date of service range, filed date, amount billed, amount paid, balance, and date last paid.[10]

In arriving at his damage figure of $2,350,691.00, Trevino stated this number "does not include [the] $1.4 million collected by Rencare during the ninety days following the sale." Those amounts are reflected in the "paid" column of the Reports. An example of the data contained in the Reports is replicated below without the patient's name.

The two reports split the accounts receivable into patients with Medicare (the 77-page report) and patients who were private pay (the 44-page report). However, Trevino applied the same methodology to both. The 44-page report contains patients whose payment history varies reflecting: (1) payments substantially less than the amount billed; (2) non-payment for some billed services; and (3) the amount paid equals the amount billed for some services.

---

[9] Trevino stated he read the depositions of various Rencare employees in order to gain knowledge on the rigorous claim collection techniques utilized. He also relied on the testimony of Kristie Harlson as confirmation of his methodology.

[10] If the figures in the "balance" column are totaled for **both** reports, the sum is $22,359,502.29.

### a. Patient Example 1 (from the 44-page private pay report)

| Date(s) of Service | | Date Filed | Amount Billed | Amount Paid | Balance | Date Last Paid |
|---|---|---|---|---|---|---|
| | | | 465 | | | |
| 02/02/2005 | 02/28/2005 | | 12,601.50 | 10,146.60 | 2,454.90 | 04/03/2005 |
| 02/23/2005 | 02/28/2005 | 03/03/2005 | 432.00 | 0.00 | 432.00 | |
| 03/02/2005 | 03/07/2005 | 03/08/2005 | 5,865.00 | 5,722.90 | 142.10 | 04/12/2005 |
| 03/09/2005 | 03/14/2005 | 03/15/2005 | 5,139.00 | 5,139.00 | 0.00 | 04/12/2005 |
| 03/16/2005 | 03/21/2005 | 03/22/2005 | 5,518.00 | 5,518.00 | 0.00 | 04/21/2005 |
| | | | 29,555.50 | 26,526.50 | 3,029.00 | |

To determine the balance actually owed by the patient in Example 1, Trevino made several assumptions. First, Trevino assumed some patients were insured by companies that contracted to pay less than the entire bill. Second, he assumed other patients were insured by companies with no Rencare contract and remained responsible for the entire billed amount. Third, to determine which patients were insured by companies with Rencare contracts and which were not, Trevino assumed that if a patient had ever paid the entire amount billed, then that patient's insurance company did not have a contract with Rencare; patients falling under this category owed the entire unpaid balance reflected in the report. Thus, under Example 1, because the entire amount billed on March 15, 2005, was paid, Trevino determined the patient's insurance company did not have a contract with Rencare and the entire amount of the outstanding balance of $3,029.00 was due.

The inequities resulting from this assumption is reflected in Trevino's testimony about a different patient listed in the 44-page report. The patient paid reduced amounts toward forty-three bills and the total amount owed on five other bills. Because she had paid the total amount owed on some services, Trevino assigned her to the no-contract group in calculating damages. Finally, based on Ehl's testimony that Rencare aggressively worked claims, Trevino assumed all of these non-contract patients would ultimately pay their balance owed.

- 13 -

b.  Patient Example 2 (from the 44-page private pay report)

| Date(s) of Service | | Date Filed | Amount Billed | Amount Paid | Balance | Date Last Paid |
|---|---|---|---|---|---|---|
| | | | 544 | | | |
| 07/25/2005 | 08/05/2005 | | 6,010.00 | 0.00 | 6,010.00 | |
| 07/08/2005 | 07/11/2005 | 07/14/2005 | 3,288.00 | 271.82 | 3,016.18 | 03/28/2006 |
| 07/18/2005 | 07/20/2005 | 07/21/2005 | 3,303.00 | 287.96 | 3,015.04 | 03/13/2006 |
| 07/22/2005 | 07/25/2005 | 08/01/2005 | 3,644.00 | 320.08 | 3,323.92 | 10/21/2005 |
| 08/15/2005 | 08/19/2005 | 08/23/2005 | 5,963.00 | 0.00 | 5,963.00 | |
| 08/22/2005 | 08/22/2005 | 08/29/2005 | 1,999.00 | 0.00 | 1,999.00 | |
| 08/15/2005 | 08/17/2005 | 01/17/2006 | 80.00 | 0.00 | 80.00 | |
| | | | 24,287.00 | 879.86 | 23,407.14 | |

Trevino likewise assumed that some patients were insured by companies that contracted with Rencare and only paid a percentage of the services provided to their insureds. For those patients, Trevino averaged the percentage of past collection reflected for that patient and applied the percentage to the total amount outstanding. Thus, in Example 2 above, despite the varying percentages of collection for different bills, Trevino merely added the amount billed, added the amount paid on a per-patient basis, and determined the percentage ratio which he then applied to the balance figure. On one patient, whose history reflected no payment toward any of his six bills, Trevino assumed a 29% collection rate because that was the average percentage paid for those patients that he assumed had contracts with Rencare.

c.  Patient Example 3 (from the 77-page Medicare patient report)

| Date(s) of Service | | Date Filed | Amount Billed | Amount Paid | | Amount Paid | Date Last Paid | Balance |
|---|---|---|---|---|---|---|---|---|
| | | | 459  MEDICARE PART A | | | TEXAS MEDICAID AND | | |
| 08/01/2005 | 08/26/2005 | 09/01/2005 | 9,232.20 | 2,513.48 | 10/06/2005 | 0.00 | | 6,718.72 |
| 01/20/2006 | 01/30/2006 | 02/10/2006 | 5,393.00 | 786.25 | 05/03/2006 | 195.82 | 05/10/2006 | 4,410.92 |
| 02/01/2006 | 02/22/2006 | 03/01/2006 | 10,752.00 | 0.00 | | 0.00 | | 10,752.00 |
| 03/14/2005 | 03/30/2005 | 03/31/2005 | 6,157.90 | 1,133.38 | 06/06/2005 | 314.34 | 06/17/2005 | 4,710.18 |
| 04/01/2005 | 04/29/2005 | 04/29/2005 | 12,233.10 | 2,767.38 | 02/23/2006 | 0.00 | | 9,465.72 |
| 05/02/2005 | 05/30/2005 | 05/31/2005 | 12,160.00 | 2,033.24 | 06/24/2005 | 538.08 | 08/11/2005 | 9,588.68 |
| 06/01/2005 | 06/29/2005 | 06/29/2005 | 4,868.00 | 834.93 | 08/03/2005 | 214.37 | 08/25/2005 | 3,818.70 |
| 07/01/2005 | 07/29/2005 | 07/29/2005 | 9,179.00 | 2,055.31 | 10/21/2005 | 0.00 | | 7,123.69 |
| 08/08/2005 | 08/10/2005 | 08/16/2005 | 2,086.00 | 0.00 | | 0.00 | | 2,086.00 |
| 02/02/2005 | 01/18/2006 | | 15,213.00 | 0.00 | | 0.00 | | 15,213.00 |
| 01/17/2005 | 01/31/2005 | 02/01/2005 | 5,447.00 | 1,140.88 | 03/04/2005 | 286.09 | 04/03/2005 | 4,020.03 |
| 02/02/2005 | 02/28/2005 | 02/28/2005 | 8,898.60 | 1,864.86 | 07/05/2005 | 462.55 | 04/20/2005 | 6,571.19 |
| 03/02/2005 | 03/07/2005 | 03/09/2005 | 2,149.70 | 409.66 | 06/06/2005 | 110.29 | 06/17/2005 | 1,629.75 |
| | | | 103,769.50 | 15,539.38 | | 2,121.54 | | 86,108.58 |

Finally, Example 3 reflects a patient with Medicare and secondary coverage under Texas Medicaid.  As with the 44-page private pay report, Trevino employed a similar methodology.  He assumed that Medicare simply paid an 80% portion of the amount billed and the secondary insurer was responsible for some or all of the remainder using the same methodology described above.  As will be discussed further below, Trevino did not review any of the underlying documents upon which both reports were based.  Likewise, Trevino did not age any of the amounts outstanding.  During cross-examination, Trevino testified that he did not "consider aging of the accounts receivable" because "all the payors were creditworthy," and there was no need to write off accounts because he was told Rencare aggressively worked claims.  Trevino performed no independent analysis or testing to determine if aging had affected Rencare's accounts receivable.

2.  *Underlying Data Reviewed by Trevino*

Renal Care's strongest criticism of Trevino's opinion was that his assumptions were based on speculation.  Trevino never looked at any of the underlying patient data to determine if his assumptions were correct.  He never examined the underlying explanation of patient benefits

(EOBs) from the insurers or Medicare to determine the reasons for non-payment or reduced payment. Renal Care presented Richard Robertson, who primarily worked in the dialysis arena, as an expert.[11] Weighing conflicting evidence is a matter for the jury, but we must consider the testimony of opposing experts in a no-evidence review because we must also consider contrary evidence showing the opinion has no scientific basis. *See City of Keller*, 168 S.W.3d at 813; *Cooper Tire*, 204 S.W.3d at 800–03. "[I]f an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded." *City of Keller*, 168 S.W.3d at 813.

Robertson reviewed the payor contracts, EOBs, and some individual patient files for the patients listed on the 44-page and 77-page reports.[12] He explained many reasons exist for reduced or non-payment by third party payors including the reimbursement rate for the services provided, the patient's coverage, the payor contracts, lapsed coverage, and other issues that require a review of the underlying documents. In addressing Trevino's opinion, Robertson noted that a basic problem was Trevino's assumption "that a patient's healthcare coverage was the same throughout that time period which [doesn't] happen." Additionally, Robertson testified that Trevino's methodology "assumes that all services are covered" by a third party payor. However, he saw one patient's EOB that specifically declined payment for services that were not covered by insurance. And when the 77-page report showed a zero under secondary payors, Robertson stated that "it might be because the amount that was paid by the primary exceeded the amount that would have been covered by the secondary," and Trevino did not take this into account. Robertson then discussed the validity of Trevino's basic assumptions based on a review of the underlying data.

---

[11] Robertson was the owner of RPM Health Care, a firm specializing in health care receivables management.

[12] We note that Robertson testified that he could not find all the patient files and data he looked for, but there was sufficient information to test Trevino's assumptions.

Specifically, Robertson tested Trevino's assumptions regarding the patients on the 77-page Medicare report by pulling eight patient files that were produced in the litigation. On seven out of the eight patients, the secondary insurance payment was posted as a primary Medicare payment, "which basically created the zero balance on the secondary side, which inflated the retained accounts receivable in Dr. Trevino's report." On the eighth patient, there was a handwritten note in the file that the patient had no secondary insurance, but on the 77-page report it incorrectly reflected private secondary insurance. The importance of Robertson's testimony is that it indicates the underlying documentation was available for Trevino to at least test his assumptions, but Trevino declined to look at the data. Robertson ultimately concluded Trevino's methodology was "extremely unreliable."

Trevino testified that he asked for patient files and underlying data but was not provided the information because his attorneys stated it did not exist or was unavailable. He further testified that he was aware that Renal Care had produced EOBs, but did not know if they were relevant, and did not ask to see them. Renal Care's expert, Robertson, had sufficient data to test Trevino's assumptions, and expert Mark Schwartz also reviewed patient EOBs that were produced. While there is evidence that certain patient documents, including EOBs, were not provided by Renal Care until over two years after the sale and then in a disorganized fashion, substantial documentation including EOBs and patient files were produced at the deposition of Kristie Harlson. The burden was on Sellers to establish Dr Tevino's testimony was admissible. *See Gammill*, 972 S.W.2d at 718. A review of the underlying documents would have allowed Trevino to test his assumptions regarding insurance, coverage, and aging.

**D. Trevino's Testimony Unreliable**

Under either an analytical gap approach or review of Trevino's opinion against the *Robinson* factors, we conclude that his opinion is unreliable. Trevino's analysis of the 44-page and 77-page reports was subjective, his assumptions were unfounded, his opinion has not been subjected to peer review, and his technique has an unknown rate of error. *See Robinson*, 923 S.W.2d at 557 (listing factors for determining reliability of expert testimony). Additionally, we note that Trevino's theory appears to have been developed for the litigation in this case. "[O]pinions formed solely for the purpose of testifying are more likely to be biased toward a particular result." *Id.* at 559.

Not only did Trevino fail to look at the data behind the numbers on the 44-page and 77-page reports, but he assumed that aging the accounts would not be necessary. He did not do any analysis to determine if the zero entries in the reports were due to lapse of coverage, improper billing, reduced coverage, or other insurance problems. Trevino's assumptions regarding contract and non-contract patients are unsupported by the evidence and the failure to test those assumptions renders his report unreliable. Trevino did not "connect the data relied on and his . . . opinion . . . to show how that data is valid support for the opinion reached." *See Whirlpool*, 298 S.W.3d at 642. There is simply too great an analytical gap between the data and Trevino's testimony. *See Gammill*, 972 S.W.2d at 726. "Reliability may be demonstrated by the connection of the expert's theory to the underlying facts and data in the case." *TXI Transp. Co.*, 306 S.W.3d at 239. Because, *inter alia*, Trevino did not examine any underlying data, his expert testimony was unreliable. Based on the analysis above, we conclude that the trial court abused its discretion in admitting Trevino's expert opinion. Likewise, it constitutes no evidence to support the jury's damage award.

## LEGAL SUFFICIENCY

Renal Care claims that without Trevino's testimony there is no evidence to support the jury's award of $750,000.00 in damages. Sellers counter that the Reports reflect an approximately $22,359,502.29 balance for all the patients listed.[13] Sellers also point to a demand letter, stating that payments of $263,473.36 were not credited to the Sellers, as some evidence of damages. Because the jury award of $750,000.00 falls within the foregoing two numbers, Sellers argue that there is more than a scintilla of evidence to support the jury's damage award.

## A. Standard of Review

In analyzing a legal sufficiency challenge, we must determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. We must review the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not. *Id*. at 819–21, 827. We must sustain a no-evidence point only if:

> (a) the record discloses a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the only evidence offered to prove a vital fact is no more than a mere scintilla; [or] (d) the evidence establishes conclusively the opposite of the vital fact.

*Id*. at 810 (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)).

---

[13] The $22 million figure is derived by totaling all sums in the balance column of the Reports, and assuming every amount billed would be collected. At closing, Sellers argued that there were two models the jury could base their damage award upon: (1) the Trevino model of $2,787,157.27 and (2) the $22,359,502.29 sum of the balances reflected in the 44-page and 77-page reports.

## B. Jury Awards

It is the plaintiff's burden to prove its damages with a reasonable degree of certainty. *A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc.*, 798 S.W.2d 606, 615 (Tex. App.—Dallas 1990, writ denied). "We recognize the jury has the discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for the jury's calculation." *Swank v. Sverdlin*, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Mayberry v. Tex. Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, no writ)). "A jury *must* have an evidentiary basis for its findings." *Salinas v. Rafati*, 948 S.W.2d 286, 289 (Tex. 1997) (emphasis added). We turn then to the evidence of damages relied upon by Sellers.

## C. Sellers' Evidence of Damages

### 1. *$22,359,502.29 Balance Based on Closing Argument*

In his closing argument, the Sellers' attorney argued that the $22,359,502.29 balance from the Reports was the outstanding amount owed to the Sellers. Their attorney derived this figure by adding the totals calculated in both the 44-page and 77-page reports and subtracting the amount paid to arrive at a balance. Several witnesses confirmed the reports reflected such a balance. However, the evidence at trial was uncontroverted that Sellers had no expectation of being paid the entire amount it billed for all patients.[14] For the same reasons Trevino's opinion based on the 44-page and 77-page reports was unreliable, the witnesses' addition of the balance figures in the two reports and counsel's argument that the reports support an award in excess of $22 million, without further explanation, does not constitute evidence to support the jury's award. "It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted

---

[14] At trial the deposition of Bob Ehl was played. Bob Ehl testified that Medicare only paid 80% of billed amounts; and certain contractual arrangements between Rencare and insurers resulted in payments less than the amount billed. Neither Sellers' expert, nor any witnesses, testified that the amount owed to Sellers equaled $22,359,502.29.

without objection." *Dallas Ry. & Terminal Co. v. Gossett*, 156 Tex. 252, 256, 294 S.W.2d 377, 380 (1956). The jury's award of "damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts." *A.B.F. Freight Sys.*, 798 S.W.2d at 615. Without some additional testimony or evidence, only speculation and conjecture support the $22,329,502.29 figure, and this cannot support the jury's award of damages. *See id.*

### 2. *The $263,473.36 Balance Based on the Demand Letter*

In June 2006, Bob Ehl sent a letter to Renal Care expressing dissatisfaction with the accounting between the parties, and demanding $263,473.36 as the amount of money collected by Renal Care that was attributable to Sellers' retained accounts receivable. The letter discusses the "true-up" spreadsheets that had been provided by Renal Care and his disagreement with the figures contained therein. Ehl concludes in the letter: "For these three months, $263,473.36 [is] due the Sellers for claims that were paid but did not show up on the 'true-up' spreadsheets, and no receipt of funds were received."

Though the trial court admitted the demand letter into evidence, Bob Ehl never discussed it in detail. He never testified how he derived his calculations or substantiated the figure reflected in the letter. On appeal, Sellers argue that "there is evidence of at least $263,473.36 in payments that were not credited to the Sellers." Furthermore, Sellers point out the preceding figure combined with the general spoliation instruction given to the jury as support for the $750,000.00 jury award.[15] The Sellers' demand letter is not proof that the demanded amount is

---

[15] The charge provided in part:
> When a party has possession of a piece of evidence at a time it knows or should have known it will be evidence in a lawsuit, and thereafter he disposes of it, alters it, makes it unavailable, or fails to produce it, there is a presumption in law that the piece of evidence, had it been produced, would have been unfavorable to the party who did not produce it.

The instruction referenced neither party.

actually owed because it contained mere conclusory statements. *See Kelley v. Sw. Bell Media, Inc.*, 745 S.W.2d 447, 449 (Tex. App.—Houston [1st Dist.] 1988, no writ). At trial, the letter's author, Bob Ehl, did not discuss the letter and explain how the demand amount was calculated or how the amounts owed for the accounts receivable were determined. In fact Ehl testified he would not opine about the amount of retained accounts receivable owed by Renal Care because he was not an accountant. Without more detail, the jury could not base their damages on the demand letter. *See Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 242 S.W.3d 67, 74–75 (Tex. App.—San Antonio 2007, no pet.). "Opinion testimony on damages must be supported by objective facts, figures or data from which the amount may be ascertained with reasonable certainty; if it is not, it is speculative and conclusory and will not support a judgment." *Id.* at 74 (citing *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649–50 (Tex. 1994)) (additional citations omitted).

### 3. The Spoliation Instruction

Sellers contend that the adverse inference contained in the spoliation instruction in this case (1) supplants legally sufficient evidence of damages, and (2) overcomes any unreliability in Trevino's expert testimony.[16] The adverse inference does not obviate the requirement that Sellers present legally sufficient evidence of their damages. *See Trevino v. Ortega*, 969 S.W.2d 950, 959 (Tex. 1998) (Baker, J., concurring) (explaining that an adverse inference is a much less severe spoliation remedy than an instruction that expressly shifts the burden of proof to the

---

[16] Renal Care raises no issue on appeal addressing the propriety of the spoliation instruction.

spoliator).[17]  For similar reasons, the adverse inference cannot compensate for the deficiencies of the Sellers' demand letter of Trevino's expert testimony.  *Cf. Robinson*, 923 S.W.2d at 553 (requiring courts "to ensure that expert testimony show some indicia of reliability").

We, therefore, conclude that neither the testimony regarding the $22,359,502.29 balance of the Reports nor the demand letter amount to a scintilla of evidence to support the jury's award of damages in this case.

## CONCLUSION

The testimony and opinion of Dr. Trevino was unreliable and thus, inadmissible and legally insufficient to support the damage award.  The demand letter and the witness testimony regarding the 44-page and 77-page reports is legally insufficient to support the award.  Because Renal Care's challenge to the legal sufficiency of the damage award is dispositive, we do not reach the remainder of the issues.  We reverse the portion of the trial court's judgment awarding Jaafar and Lewis damages, interest, and attorney's fees and render judgment that Jaafar and Lewis take nothing.

Rebecca Simmons, Justice

---

[17] *See also Kammerer v. Sewerage & Water Bd. of New Orleans*, 633 So. 2d 1357, 1359 n.3 (La. Ct. App. 1994) (Waltzer, J., concurring); *Battocchi v. Wash. Hosp. Ctr.*, 581 A.2d 759, 765 (D.C. 1990); *Bronson v. J.L. Hudson Co.*, 135 N.W.2d 388, 391 (Mich. 1965) (O'Hara, J., dissenting, joined by Dethmers and Kelly, JJ.); *Maszczenski v. Myers*, 129 A.2d 109, 114 (Md. 1957) ("[I]t is well settled that this inference does not amount to substantive proof and cannot take the place of proof of a fact necessary to the other party's case.") (citing, *inter alia*, *Stocker v. Boston & M.R.R.*, 151 A. 457 (N.H. 1930); *Eldridge v. Terry & Tench Co.*, 129 N.Y.S. 865 (N.Y. App. Div. 1911); *Rosenthal v. Ostrow*, 134 A. 384 (Pa. 1926); *F.R. Patch Mfg. Co. v. Prot. Lodge, No. 215, Int'l Ass'n of Machinists*, 60 A. 76, 84 (Vt. 1903); 2 WIGMORE ON EVIDENCE § 290, at 179 (3d. ed. 1940); *id*. § 2524 at 441).  We decline to follow *Wackenhut Corrections Corp. v. de la Rosa*, 305 S.W.3d 594, 626 (Tex. App.—Corpus Christi 2009, no pet.), because its explanation that the adverse inference will always constitute legally sufficient evidence but never factually sufficient evidence is not supported by the authority it cites.  *See generally Trevino*, 969 S.W.2d at 953–61 (Baker, J., concurring).